## United States' Exhibit List

Exh. 1          Letter to Mushrush, M.D., dated Nov. 5, 2002

Exh. 2          Festin, M.D., Resident Oral Evaluation, dated
                June 19, 2001

Exh. 3          Alexander, M.D., Resident Oral Evaluation, dated
                June 19, 2001

Exh. 4          Letter to Mushrush, M.D., dated Apr. 3, 2002

Exh. 5          E-mail from Gurerra, M.D., dated Apr. 1, 2002

Exh. 6          Bolton, M.D., Preceptor Evaluation for Mar. 2001

Exh. 7          Osser, M.D., Supervisor Evaluation, dated Jul. 7,
                2001

Exh. 8          Osser, M.D., Preceptor Evaluation for Jul. & Aug.
                2001

Exh. 9          E-mail from Gurerra, M.D., dated Mar. 4, 2002

Exh. 10         Promotion Committee Notes, dated Apr. 26, 2002

Exh. 11         E-Mail from McCarley, M.D., date Jul. 8, 2002

Exh. 12         Letter to Badgaiyan, M.D., dated Mar. 3, 2004

Exh. 13         Letter to Farmer (at Board), dated Mar. 14, 2004

Exh. 14         Letter to Badgaiyan (from Board), dated Jun. 18,
                2004

Exh. 15         Letter to Badgaiyan (from Board), dated Oct. 22,
                2004

Exh. 16         Change of Program Application, dated Aug. 12,
                2004

Exh. 17         Letter to Attorney Cirel, dated Jan. 20, 2005

Exh. 18         Letter to Board, dated Feb. 11, 2005

Exh. 19         EEO Counselor's Report, dated Oct. 4, 2002

Exh. 20          <u>Burlington Northern & Sante Fe Railway v. White</u>,
                 2006 WL 1698953 (U.S. Sup. Ct. 2006)

Exh. 21          Badgaiyan, M.D. Deposition

Exh. 22          McCarley, M.D. Deposition

Exh. 23          Formal EEO Complaint filed September 4, 2002

# EXHIBIT 1

# McLean Hospital

115 Mill Street, Belmont, Massachusetts 02478-9106
Telephone 617 855-2000, FAX 617 855-3299



November 5, 2002

Grace Mushrush, M.D.
Assistant Chief of Psychiatry for Education and
Director of Psychiatric Residency Training
Brockton VA Medical Center
940 Belmont Street
Brockton, MA 02307

Dear Dr. Mushrush,

I am writing concerning our previous conversations with regard to Dr. Rajendra Badgaiyan during and
subsequent to his rotation on the McLean Hospital Clinical Evaluation Center. As you are aware,
Dr. Badgaiyan's performance during his rotation was highly variable. He stated that he did not want to
have to do a rotation with us at all, and took several days off that were not excused. While doing some
complete work ups, there were times when I reviewed his work after supervision and noted that he had not
made the recommended changes to his work up prior to leaving for the day. He had significant problems
interacting with nursing staff and triage staff in ways that interfered with good patient care.

When we last discussed these issues, you requested that he be allowed to return to the CEC to complete a
remedial rotation to try to address these issues. As you know, I reviewed this with numerous staff involved
in his rotation, including Paul Barreira, M.D., Asha Parekh, M.D., Victor Petrella, APRN, BC, and
Diane Bedell, LICSW. Given our serious concerns during his rotation, we felt that we would be unable to
provide such a remedial rotation in addition to our usual teaching rotations for residents, medical students,
and clinical nurse specialist students.

Please let me know if you would like to discuss this further. We enjoy working with the Harvard South
Shore Psychiatry Residents, and regret that we are unable to provide a remedial rotation for him.

Sincerely,

Sara M. Bolton, M.D.
Medical Director, Clinical Evaluation Center

Paul Barreira, M.D.
Director, Medical Education
Chief, Community Clinical Services

EXHIBIT 2

## RESIDENTS ORAL EXAMINATION EVALUATION FORM

Resident: _Rajendran Badgayan_   Rater: _De Foster MD_   Date: _6/19/01_

(Scoring system: 5=outstanding; 4=good; 3=satisfactory; 2= marginal, 1=unacceptable)

I. Interview: _2.2_
   A. Ability to establish rapport with patient: _2.5_ Could improve by showing
      more interest + connection with the patient.
   B. History taking _2_
   Failed to ask questions re: mood & unable to establish a mood
   syndrome or psychosis whether related to ETOH use or not.
   Would have pursued psychosocial issues.
   C. Mental status examination: _2_

II. Presentation of case: _3_

III. Differential diagnosis: _3_

IV. Summary and Biopsychosocial Formulation: _3_

V. Work-up: _2_
   Had to be coaxed several times re: workup.

VI. Treatment: _3_

VII: Other Issues: _____

Exam discussed with resident? Yes _/_ No ___   Signed: _De Foster MD_

# EXHIBIT 3

2.25
overall

## RESIDENTS ORAL EXAMINATION EVALUATION FORM

Resident: _Badgaiyan_    Rater: _Alexander_    Date: _6/19/01_

(Scoring system: 5=outstanding; 4=good; 3=satisfactory; 2= marginal, 1=unacceptable)

I. Interview: _2.4_
   A. Ability to establish rapport with patient: _3_
      (generous)
   B. History taking _2.5_
      nonempathic

   C. Mental status examination: _2.5_

II. Presentation of case: _2_

III. Differential diagnosis: _2_

IV. Summary and Biopsychosocial Formulation: _2.1_

V. Work-up: _ADLs (trim) 3 neuro exam_

VI. Treatment: _2.5_

VII: Other Issues: _Dr. Patient - "you were so busy thinking of your next question you did not listen to me"_

VIII. Fund of technical Knowledge (5) - not relevant

Exam discussed with resident? Yes ✓ No ☒    Signed: _Rubinstein?_

# EXHIBIT 4

# Department of Veterans Affairs

*Copy*

# Memorandum

Date:  April 3, 2002

From:  Laurie Cranford, RMC

Subj:  Letter of Complaint

To:  Dr. Grace Mushrush, Director of Residency Program

On Sunday, Feb. 3, 2002 Mr. David Nelson was admitted to unit 23C. Although not initially evident on admission, Mr. Nelson was in a severe manic state. Within a couple of hours after arrival to the unit, this mania manifested itself. He became loud and threatening. He dismantled the locked double doors and escaped from the unit. The patient was returned by the police however, he continued to be resistive, threatening, and non-compliant. The patient has to be placed into restraints for the protection of self and others. Initially the patient broke the leather restraints. After being re-restrained he managed to break free of the restraints on 2 or 3 occasions.

During this time period, Dr. Badgaiyan, POD ordered PO medication (Olanzapine and Trazadone), as that was all the patient would agree to take. Patient also stated he had allergies to many neuroleptics. There is no clear documentation of this fact. None of the medications given had any effect on the patient in regards to relieving his severe agitation and mania. The charge nurse suggested to Dr. Badgaiyan other IM medication, which could be tried but met with refusal.

As a result of this prolonged period in which the patient remained manic and agitated and fighting against the restraints, he suffered friction burns, and blistering of both wrists. Patient also complained of neck and shoulder pain.

The nursing staff on the unit raised the issue that they felt this patient had been mismanaged and subsequently felt it to be abusive. Staff also felt that not only was the patient's safety compromised but that the safety of the staff and other patients were also jeopardized by lack of proper medical support, in their opinion.

Another patient also eloped when the doors were broken; fortunately he was found and returned safely to the unit by the VA Police.

As a result of these concerns this writer sent a report of contact to Dr. Gurrera, Chief of Inpatient Psychiatry, detailing said concerns. Per Dr. Gurrera"s suggestion a meeting was arranged. Those in attendance were Dr. Gurrera, Dr. Mushrush, Director of Residency Program, Dr. Festin, Assistant Director of Residency Program and the patient's Attending Physician, Karen Bassett, Clinical Coordinator of Mental Health, Katie Terevainen, RN and Charge Nurse on duty that evening, and the undersigned. It is the opinion of this writer that Dr. Badgaiyan was unable or unwilling to understand that his management of the patient was in anyway inadequate and endangered the patient, the patient population, and the staff's safety.

Laurie Cranford, RNC

CC:  Dr. Ron Gurrera, Chief Inpatient Psychiatry

VA FORM
MAR 1989  2105

EXHIBIT 5

# Mushrush, Grace J.

| | |
|---|---|
| **From:** | Gurrera,Ronald |
| **Sent:** | Monday, April 01, 2002 7:35 PM |
| **To:** | Mushrush, Grace J.; Festin, Fe Erlita; Swett, Chester P. |
| **Cc:** | Gurrera,Ronald |
| **Subject:** | Badgaiyan meeting |

Grace,

Per our discussion, I am summarizing my observations from the meeting today on 23C, at which Dr. Badgaiyan, Laurie Cranford, Kathleen Tavlanien, you and Fe were present.

- Dr. Badgaiyan was the POD who admitted patient N4203 on 2/3/02. Although initially Dr. Badgaiyan reports the patient was not severely agitated, he rapidly became so, eventually breaking leather restraints and disassembling the ward door and eloping within a 6-hour period.
- Based on the patient's own report of an "allergy" to haloperidol and another antipsychotic, Dr. Badgaiyan determined that the use of all typical antipsychotic medications should be avoided, even though his own notes indicate that the "allergy" was most likely an acute dystonic reaction.
- As the patient became more agitated, he prescribed oral olanzapine and lorazepam, despite multiple requests from nursing to consider more potent, parenteral agents. (His intense agitation is corroborated by a CPK of >1000 and extensive soft tissue injuries caused by his restraints.)
- At approximately 9 pm, with the third dose of olanzapine 10 mg, Dr. Badgaiyan also prescribed trazodone 200 mg. He explained that this was for "sedation". His own notes indicate that his working diagnosis was bipolar disorder, and the patient was unquestionably manic. When asked about the potential effect of trazodone on a manic patient, he appeared unaware of its potential to exacerbate a manic state.
- Throughout the discussion he repeatedly cited his concern about the potential for "cross-sensitivity" between all classes of typical antipsychotic agents as the justification for avoiding agents known to be effective in behavioral emergencies. However, upon persistent questioning it was apparent that he did not understand the distinction between sharing a pharmacologic mechanism of action, and immunologic cross-sensitivity.
- Although he spontaneously described this patient as the most difficult he has ever encountered, and perhaps the most difficult the ward has ever encountered, he at no point attempted to contact his staff back-up for a consultation. In general, his actions on that day, and his demeanor today, failed to demonstrate the level of concern that this very dangerous, potentially disastrous, situation demanded. (In particular, this patient dismantled the ward door, permitting himself *and another patient* to elope.)
- Throughout the meeting today he defended his actions vigorously, insisting that his management of the patient was exemplary and challenging others to tell him what should have been done differently, even as we did so.

# EXHIBIT 6

# HARVARD SOUTH SHORE
## PSYCHIATRY RESIDENCY TRAINING PROGRAM

### PRECEPTOR EVALUATION OF TRAINEE

...edback is essential if our trainees are to improve their clinical skills.  Please complete one of these forms for
...ch psychiatric trainee who rotated through your service.  Please be as explicit as possible in your answers.
...ese evaluations will be available for review by both the trainees and the committee which certifies the
...ainees' clinical competence for the American Board of Psychiatry and Neurology.

...ease rank skills as follows:  1 = unsatisfactory; 2 = marginal; 3 = satisfactory; 4 = good; 5 = outstanding;
...O. = not observed.

...ame of Trainee  _Rajendra Badgaiyan_  PGY _1D_

...ervice _Psychiatry (McLean)_  From _March 2001_ To _3/31/01_

...n-patient? _____  Ambulatory Care? _____  Name of Clinic _Clinical Evaluation Center_  (D1)

## PERFORMANCE

| | | | | |
|---|---|---|---|---|
| History taking | 2 | | Thoroughness of follow-up | 2 |
| Physical exam | 3 | | Use of lab + other dx. tests | 3 |
| Mental status exam | 2 | | Doctor/patient relations | 4 |
| Problem formulation | 2 | | Relations with families | 4 |
| Record keeping | 1-2 | | Relations with peers | 3 1 |
| Initial plans | 3 | | Relations with other staff | 1 |

## CAPABILITIES

| | | | | |
|---|---|---|---|---|
| Knowledge | 2 clinical / 4 research | | Efficiency | 2 |
| Attitude | 1 | | Teaching ability | N/A |

Rate of learning and ability to learn  _3 3_

Additional comments, either specifically related to the items listed above, or generally:  _Dr. Badgaiyan's
performance varied considerably with some thorough work-ups
but others with deficiencies.  He took several days off
and tried to take others, so that it was difficult to count
on his being part of our service. He expressed dislike well + as
have had to rotate on an served at all from the beginning, and
this is likely to have_ Please print name _led to the above problems. I reviewed
his performance with many of our staff psychiatrists/nurses, who, their input is_

**Please return to Grace J. Mushrush, M.D.**, Assistant Chief of Psychiatry for Education and Director of
Psychiatric Residency Training at Brockton VA Medical Center (116A7).

Signed _____ M.D.

# EXHIBIT 7

HARVARD - SOUTH SHORE                    (Brockton/W.Rox.)
Psychiatry Resident Training Program

SUPERVISOR EVALUATION OF RESIDENT

Name of Resident ___Rajendra Badgaiyan, MD___ PGY _II_

Supervisory period __6/2001 (2 wks.)__  Setting _Taunton State Hospital_

**What are his/her greatest strengths?**

_had 2 meetings. Dr. B is a very bright, knowledgeable physician — learns quickly. Knows the literature in biological psychiatry and how to read it critically._

**What are his/her greatest weaknesses?**

_Knowledge of evidence-based clinical psychopharm is not at the level you would expect it to be given his other strengths. Also — he should speak a bit more slowly to help with making himself understood in English._

**What can be added or changed in this resident's training experience that might address these weaknesses?**

_He should attend all required clinical training activities — I am sure that if he is there, he will absorb the material and increase his skills._

**Please rate this resident on a scale of 1 to 10, where 10 is the best score:**

_?_ 1. Capacity to develop supervisory alliance. _I do not know enough to comment on the quality of the alliance_

_3_ 2. Conduct of sessions (presented on (time), prepared for supervision with process notes). _did not carefully prepare the papers as requested & asked him to do a good series given_

_Not time_ 3. Evaluation of psychodynamic capacities for resident at his/her level (empathy, formulation of case)

_[blacked out]_ 4. Evaluation of capacity for case management for resident at his/her level. _just he was only going to do one paper with me_

_7_ 5. Evaluation of psychopharmacologic capacities at his/her level. _From what little I have observed, he has an above average knowledge base for a PGY 2. I just don't know how well he's applying it._

Additional comments may be written on the back of the form.

I have ___/have not _✓_ discussed these points with the resident.

Please return this evaluation to Grace Mushrush, M.D. (116A3).

Supervisor's Signature: _David W. Osser MD_  Date _7/8/01_
                        DAVID OSSER, MD

# EXHIBIT 8

HARVARD ... ....

## PSYCHIATRY RESIDENCY TRAINING PROGRAM

### PRECEPTOR EVALUATION OF TRAINEE

eedback is essential if our trainees are to improve their clinical skills.  Please complete one of these forms for
ach psychiatric trainee who rotated through your service.  Please be as explicit as possible in your answers.
hese evaluations will be available for review by both the trainees and the committee which certifies the
rainees' clinical competence for the American Board of Psychiatry and Neurology.

lease rank skills as follows:  1 = unsatisfactory; 2 = marginal; 3 = satisfactory; 4 = good; 5 = outstanding;  *3.4*
.O. = not observed.

Name of Trainee _Raj. Badgaiyan MD_ PGY _3_

Service _DOM - REACH_ From _July 01_ To _Aug 01_ /_2001_

In-patient? _____ Ambulatory Care? _✓_ Name of Clinic _REACH_

## PERFORMANCE

| | | | | |
|---|---|---|---|---|
| History taking | 5 | Thoroughness of follow-up | 3 | _not aware of medical issu_ |
| Physical exam | NA | Use of lab + other dx. tests | 1 | _Did not take into account lab abnormal. and meds history_ |
| Mental status exam | 5 | Doctor/patient relations | 5 | |
| Problem formulation | 4 | Relations with families | NA | |
| Record keeping | 2 — _didn't write note when he changed a patient meds._ | Relations with peers | NA | |
| Initial plans | 3 | Relations with other staff | ~~3~~ | _staff found him un-involved with the team. Missed many team mtg_ |

## CAPABILITIES

| | | | | |
|---|---|---|---|---|
| Knowledge | 5 | Efficiency | 2 | _Did not turn in workload sheets until it was too late to get credit for his work_ |
| Attitude | ~~2~~ 5 _It was "1" at the start and "4" at the end._ | Teaching ability | 4 | |
| Rate of learning and ability to learn | 5 | | | |

Additional comments, either specifically related to the items listed above, or generally:

_See over. Overall I rate him a 3 - barely satisfactory._

Signed _David N. Osser_ M.D.

_3.4_

Please print name _DAVID OSSER, MD_

Please return to Grace J. Mushrush, M.D., Assistant Chief of Psychiatry for Education and Director of
Psychiatric Residency Training at Brockton VA Medical Center (116A7).

1)

Raj is one of our brightest and most capable residents with an established track record as an investigator and academician. He showed several strengths here — good rapport and ability to engage a patient psychotherapeutically (note attached from patient documenting this), good ability to write up his cases clearly, coherently, with good psychiatric diagnosis. But then, there were 4 problem areas I need to note:

① He didn't cooperate at all for the first two weeks, didn't work up assigned patients (didn't inform patient or staff that he didn't follow through) until we had an extended discussion about his lack of respect for my "approach" which was "not evidence based". This was clarified and he stated he was satisfied that he could learn a lot here. It coincided with a general self-examination he was going through about whether to stay in the residency. Evidently he made a positive commitment at that point and starting with week 3 he seemed motivated and productive. But during my 3 weeks of leave in August he was supposed to attend team meetings and make himself available during his usual REACH hours and staff reported to me that he was not there. In addition, he apparently never met with the supervisor he was assigned for his case of short term CBT. He did meet with the patient regularly (weekly for 5 weeks) and the patient liked him (attached note) But Raj said he met with the supervisor Barbara Cormley once and decided she was inexperienced and had nothing to offer so he didn't see her again. I discussed this with her supervisor Jim Curran and he and she insist he never met with her, even once. Confronting Raj on this produced an assertion that he did meet with her. No matter how you look at it, his disrespect for a colleague here is again very problematic. Ms. Cormley, by the way, is a somewhat older trainee, with more grey hair than

②

Raj and she has had lots of experience with CBT. Dr. Curran has asked me to convey his concern that a client here was being treated without supervision.

④ A second area of concern is Raj's assessments of medical issues with the cases I assigned him. In 2 of his 4 cases he evidently failed to look at the patients' history / physical and medical problem list. In his own note, he said there were no medical problems. However, in one case the patient had glaucoma and was receiving a topical beta blocker. In the second case the patient had a triglyceride level of >600 on admission to REACH. The patient is on valproate, which Raj continued. VPA can increase triglycerides. Even if Raj didn't know that, he should have listed this abnormal lab in his workup where I could have noticed it and told him about the issue. I discussed these cases with Raj. He said that at the time he had many new patients and could not get to checking all their labs. That's fine, but he should say in his note "will check labs later," rather than "no medical problems".

There were other concerns about his not knowing what was in the patients' records. I have an email from Dr. Curran in which he complained that Raj's treatment plan in a progress note stressed the need for indiv individual therapy. But at that point he was in therapy and had had 5 sessions with one of our psychology interns. Clearly he wasn't reading the record.

⑤ Another problem I noted was one case where he made a medication change contradicting his plan expressed in his previous note, and did not write a note about it. None of his subsequent notes mentioned the change. When I took over care of the patient, the patient told me what he was on and it was different from the notes. But, checking the order sheet confirmed that Raj did make that change. (Notes said Seroquel was stopped but later he restarted it). This may seem minor but he only had a few cases here and I put a

③

They were past the ~~dea~~
deadline for getting credit

④ The last issue was that Dr. B. turned in <u>all</u> his workload
sheets ~~until~~ weeks after completing his time in REACH. They're
supposed to be done within a few days of each visit. As
a result, we did not get credit for any of Raj's work here.
To my recollection this has never happened with any other REACH
resident. Raj said he didn't realize the timing was important
but I believe I stressed that: he says I didn't.

In summary I was prepared, at the last supervision, to say
that Raj had made a turnaround in REACH and was doing
good work. But in the next few weeks, I was made aware
of the above problem behaviors and careless, rushed work
and I felt that he should not get a passing grade. Then
I met with him and discussed all of the above. His attitude
was appropriately concerned, apologetic, not so defensive as he
had been in July. I believe that he sincerely intends to use
this feedback to improve his performance in future rotations.
I have alerted Jim Levitt to watch out for his thoroughness of
review of medical issues and documentation of followups. Accordingly
I am giving him an overall passing grade of 3.

David N. Osser MD

# EXHIBIT 9

## Mushrush, Grace J.

**From:**      Gurrera,Ronald
**Sent:**      Monday, March 04, 2002 2:58 PM
**To:**        Mushrush, Grace J.
**Cc:**        McCarley, Robert W.; Swett, Chester P.
**Subject:**   psychiatry resident issues

Grace,

I'm following up on our discussion earlier today. As I told you then, I was called at 4:30 this morning by the WX MOD who complained that Dr. Badgaiyan had been refusing to accept a patient from the WX ER until a series of demands were met. This was a female patient followed at the JP residential program, who presented with suicidal ideation. Dr. Badgaiyan insisted that the results of all lab work be known before he would accept the patient, despite the MOD's assessment that the patient was medically stable for transfer. In particular, what the MOD complained about is that he would not accept her verbal report of a negative serum toxic screen, but insisted that she fax the report to him (the computer at WX was down, so he could not directly view the results). After she had complied, she stated "he called back to yell at me because he also wanted a urine tox screen". When I called Dr. Badgaiyan, he was (not surprisingly) unable to explain his clinical rationale for demanding a urine toxic screen after the results of the serum screen were known. He then spontaneously reported that he had already instructed the AOD to accept the patient. I suspected that this was not accurate, and when I called the AOD she confirmed that he had only instructed her to accept the patient AFTER speaking with me on the telephone. During my discussion with Dr. Badgaiyan he also claimed he was unaware of my previous admonitions to residents about the need to cooperate with VA MODs, especially those in the Boston system. This was surprising to me, as I have made my views very clear on several lengthy e-mails that were distributed to all residents.

Unfortunately, this incident does not appear to represent an isolated lapse of judgment. As I write I am arranging a meeting with nursing staff on 23C concerning a recent incident in which it is alleged that Dr. Badgaiyan failed to respond in a timely manner to the need for emergent medication, and refused to consider nurses' advice re: the need for medication. Ultimately, he chose to use olanzapine p.o. in this emergent situation (this patient subsequently broke his 4-point restraints and broke through BOTH seclusion area doors). I am told the patient remained in restraints for several days, and suffered injuries related to excessive agitation while in restraints. I should point out that I have not yet heard Dr. Badgaiyan's side of the story, but the facts presented so far indicate the situation was not handled appropriately.

Per your request, I have cc'd this to Dr. McCarley.

# EXHIBIT 10

HARVARD SOUTH SHORE PSYCHIATRY RESIDENCY TRAINING PROGRAM
COMMITTEE ON PROMOTIONS
Thursday, April 26, 2002

Attendance: Dr. Grace Mushrush, Tr. Director; Dr. Fe Festin, Assoc. Tr.
Director; Dr. Chester Swett, Chief of Psychiatry; Dr. Ronald Gurrera,
Assistant Chief of Psychiatry for Clinical Programs; Drs. James Levitt
and David Osser, Faculty

The Harvard South Shore Psychiatry Residency Committee on Promotions met
on Thursday, April 26, 2002 and approved the promotions of all the PGY-
III and PGY-IV residents with the exception of Rajendra Badgaiyan, M.D.

In summary, Dr. Badgaiyan's participation in the residency has been
minimal, and his evaluation file contains many complaints from
attendings and nurses concerning his poor attitude when staff members
try to engage him in cooperative team work.

To enumerate a number of these incidents:
1. He was asked to leave the medical service at W. Roxbury because
   he refused to take direction from his female attending and
   resident.
2. He failed the rotation on the Clinical Evaluation Unit at McLean
   and the training director received a phone call from the director
   of the Unit who said that Dr. Badgaiyan was the most difficult
   resident with whom they had ever tried to work and that he was
   often not even there. They seriously raised the question as to
   whether he should be allowed to continue in training. (This was
   the composite evaluation but was submitted by Dr. Sara Bolton.)
3. When assigned to Brockton In-Patient Psychiatry, he informed Dr.
   Chang that he was there strictly as an observer and that he would
   not take responsibility for working with any patients. He also
   did not meet expectations on Dr. Alexander's service. He has
   satisfied only 7 months of his 9-month requirement for In-Patient
   Psychiatry.
4. He did not pass his PGY-II oral examination, and after our
   receiving complaints about his lack of commitment and cooperation
   from the attendings on nearly every rotation that he started, he
   was placed on probation. The training director met with him and
   explained that in order to be removed from probation, he needed
   to improve his attitude and to take the oral exam over. She even
   offered to go over cases with him to help him prepare for a
   repeat oral exam. He refused to redo the exam, saying that the
   preceptors were prejudiced against him because they were jealous
   of his research work and that they would never pass him.
   Finally, Dr. Swett ordered him to take the retest, and he did
   pass (nearly one year after he was placed on probation).
5. He refuses to attend the preceptor sessions in evening clinic
   because the preceptor ''offended him'' by saying that he should
   attend evening clinic and that he should see the patients who are
   assigned to him.
6. He has not taken seriously the recommendations of the nurses on
   the ward when he is POD. Most recently this resulted in a manic
   patient inadequately sedated, breaking out of restraints, taking

the door off the locked unit, and escaping and allowing another
patient to escape.  Despite his admission that this was the most
difficult patient whom he ever treated, he did not even consult
his attending back-up, and when confronted about his
mismanagement of the patient, he arrogantly defended his
approach.

The Promotions Committee was concerned about the extent of Dr.
Badgaiyan's willingness to distort and to project blame for his
inadequacies.  While the Committee could not demand that Dr. Badgaiyan
obtain some psychotherapy, it certainly would recommend it.

Finally, it was the recommendation of the Committee that Dr. Badgaiyan
not be promoted in October 2002 and that he be required to do three
additional months of training with reconsideration of his promotion to
PGY-IV for December 31, 2002.

# EXHIBIT 11

**Mushrush, Grace J.**

| | |
|---|---|
| **From:** | McCarley, Robert W. |
| **Sent:** | Monday, July 08, 2002 5:15 PM |
| **To:** | Mushrush, Grace J. |
| **Subject:** | FW: Residency |

fyi...

---

| | |
|---|---|
| **From:** | Robert W. McCarley[SMTP:robert_mccarley@hms.harvard.edu] |
| **Sent:** | Monday, July 08, 2002 3:10 PM |
| **To:** | Rajendra Badgaiyan |
| **Cc:** | MUSHRUSH_MD.GRACE_J+@BOSTON.VA.GOV; Chester Swett; Margaret Klausner; Robert McCarley |
| **Subject:** | Residency |

Raj,

After consultation with Drs. Swett and Mushrush, I have decided that you will be asked to
complete the following program:
1. Two months inpt, ending Aug 31, 02.
2. Four months of outpt with Dr Levitt, ending Dec 31, 02, and develop a webpage in collaboration with Dr. Mushrush.
3. Share your super cognitive neuroscience knowledge with the other residents, in the format of a
lecture(s).

Raj, the bottom line on your inpatient work was that there were some problems and
that further training was necessary.

Re the Dupont-Warren fellowship. This is flexible in terms of how long it runs for and the rate you want the money distributed. Stuart Hauser and I as co-chairs of the Research Committee would be very happy to consider any arrangement you would want.

With best wishes,
Bob McCarley

Robert W. McCarley, M.D.
Professor and Chair, Harvard Dept. of Psychiatry,
Deputy Chief of Staff/Mental Health Services
VA Boston Healthcare System
Co-Chair, Harvard Psychiatry Executive Committee
940 Belmont St.
Brockton, Ma 02301

Phone: 508 583-4500x3723
Fax: 508 586 0894
robert_mccarley@hms.harvard.edu

1

# EXHIBIT 12



# Commonwealth of Massachusetts
# Board of Registration in Medicine

560 Harrison Avenue, G-4
Boston, Massachusetts 02118
(617) 654-9800

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

Enforcement Division Fax: (617) 451-9568
Legal Division Fax: (617) 357-8453
Licensing Division Fax: (617) 426-9358

**MARTIN CRANE, MD**
BOARD CHAIR

**NANCY ACHIN AUDESSE**
EXECUTIVE DIRECTOR

March 3, 2004

Rajendra D Badgaiyan, M.D.
122-A Sycamore Street
Somerville, Massachusetts 02145

Re: Application Number          220501

Date Application Received:     03/02/2004

Dear Dr. Badgaiyan :

Your application for a full medical license in Massachusetts  was received on the above date.

The Licensing Unit will assist you in expediting the processing of your application,  however, please be advised that it can take up to twelve (12) weeks to process an application.  Throughout this process, we will provide you with periodic updates regarding the status of your license application.

You will receive a notification of missing documents for your full license application in four weeks.  Please be advised that if your full license application is incomplete after 6 months, you will be required to update the application and specific documents that are 6 months old.  For additional licensing information, you may access the Board's website  at  www.massmedboard.org .

Sincerely,

Licensing Staff

BRM0089

# EXHIBIT 13

*Badgaiyan          Exhibit #15*

# The Harvard South Shore Psychiatry Residency Training Program
## VA Boston Healthcare System

**Director**
Grace J. Mushrush, M.D.
*Assistant Professor, Harvard*
*Department of Psychiatry*

**Associate Director**
Fe Erlita Festin, M.D.
*Instructor, Harvard*
*Department of Psychiatry*




VA Boston Healthcare System
Brockton Division
Psychiatry Education (116A7)
940 Belmont Street
Brockton, MA 02301
(508) 583-4500 x 2457/2456

Fax (508) 895-0181
grace_mushrush@hms.harvard.edu

April 14, 2004

APR 15 2004

Board of Registration in Medicine
Attn: Richard Farmer, Jr.
Licensing Specialist
560 Harrison Avenue, G-4
Boston, MA 02118

Dear Mr. Farmer:

Enclosed please find the evaluations of Dr. Rajendra D. Badgaiyan
which were requested by the Board for Dr. Badgaiyan's full license.

If you require additional information, please do not hesitate to
contact me.

Very truly yours,

*Grace J. Mushrush, M.D.*

Grace J. Mushrush, M.D.
Asst. Chief of Psychiatry for Education
and Director, Residency Training Program

Enclosures

BRM0113

# EXHIBIT 14

# Commonwealth of Massachusetts
# Board of Registration in Medicine

560 Harrison Avenue, G-4
Boston, Massachusetts 02118
(617) 654-9800

Enforcement Division Fax: (617) 451-9568
Legal Division Fax: (617) 357-8453
Licensing Division Fax: (617) 426-9358

June 18, 2004

Rajendra D. Badgaiyan, M.D.
122-A Sycamore Street
Somerville, MA 02145

Re: Full License Application

Dear Dr. Badgaiyan:

At its June 16, 2004 meeting, the Licensing Committee, a subcommittee of the Board of Registration in Medicine, reviewed your full license application. The Licensing Committee also met with you to discuss the information contained in this application.

The Licensing Committee has deferred further consideration of your application until you have undergone a Board approved psychiatric evaluation and met with Dr. Luis Sanchez, Director of Physician Health Services to determine your suitability for a Behavioral Health Monitoring Contract.

Enclosed please find a list of Board-approved evaluators for this psychiatric evaluation. It will be necessary for you to execute a waiver and release authorizing me to speak and otherwise exchange information with any proposed evaluator before any examination is performed. Additionally, you will also be required to complete releases permitting me to exchange information with Dr. Sanchez. The names of Board-approved practitioners are as follows:

Marilyn Price, M.D. (781-321-6544), 578 Main Street, Malden, MA 02418;

Rohn Friedman, M.D. (617-332-7685), 320 Otis Street, West Newton, MA 02165; and

Donald Meyer, M.D. (617) 491-6868, 124 Mount Auburn Street, Suite 440 South, Cambridge, MA 02138.

BRM0101

Page Two
June 18, 2004

Please inform me of the dates of any appointments as soon as possible so that I may send you the necessary releases. As a reminder, you will be responsible for all costs associated with any evaluation. You may contact me at 617-654-9853 if you have any questions.

Sincerely,

Susan Cornacchio, RN, JD
Board Counsel
Physician Health & Compliance Unit

# EXHIBIT 15



# Commonwealth of Massachusetts
# Board of Registration in Medicine

560 Harrison Avenue, G-4
Boston, Massachusetts 02118
(617) 654-9800

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

Enforcement Division Fax: (617) 451-9568
Legal Division Fax: (617) 357-8453
Licensing Division Fax: (617) 426-9358

**MARTIN CRANE, MD**
BOARD CHAIR

**NANCY ACHIN AUDESSE**
EXECUTIVE DIRECTOR

October 22, 2004

Rajendra D. Badgaiyan, M.D.
122-A Sycamore Street
Somerville, MA 02145

Re: Full License Application

Dear Dr. Badgaiyan:

As you may recall, at its June 16, 2004 meeting, the Licensing Committee, a subcommittee of the Board of Registration in Medicine, met with you to discuss the information contained in your full license application. The Licensing Committee deferred further consideration of this application until you had undergone a Board approved psychiatric evaluation and met with Dr. Luis Sanchez, Director of Physician Health Services, to determine your suitability for a Behavioral Health Monitoring Contract.

On August 4, 2004, you emailed me and indicated that you had begun meeting with Board approved psychiatrist, Dr. Donald Meyer. You stated that Dr. Meyer would not be able to complete his evaluation until he had met with two psychiatrists involved with your residency training at the Boston VA Hospital. You added that the VA Hospital attorney had informed Dr. Meyer that he could not speak to these physicians because of a possible conflict of interest and that you were attempting to contact attorney Paul Merry to resolve this issue. However, Attorney Merry was on vacation and Dr. Meyer was scheduled to begin a three week vacation within the next few days.

You indicated that further delay in the processing of your application could result in the loss of your fellowship and asked if the Committee would accept an interim report from Dr. Meyer consider a limited license application so that you could begin your training as soon as possible. You were advised to submit a change of program application as well as the previously requested information so

BRM0103

Page Two
October 22, 2004

that this matter could be presented to the Licensing Committee in a timely manner.

In a September 7, 2004 email, you informed me that your former Program Director had not signed the change of program application and asked if the Committee would instead consider your full license application. In my email response, I advised you that you had filled out a change of program application to expedite the application process during the summer months when your attorney and Dr. Meyer were on vacation. Since you had not been able to complete your change of program application, I informed you that you needed to go forward with your full license application and complete the evaluations by Dr. Meyer and Dr. Sanchez. You replied that you had completed both of these evaluations and were still interested in applying for the change of program license and asked whether the Committee would consider accepting this application without the Program Director's signature.

On September 21, 2004, the Board received your completed change of program application. The Board has not received Dr. Meyer's finalized evaluation and has not received a recommendation from Dr. Sanchez regarding your suitability for a monitoring contract.

Please be advised that the materials in your March 2004 full license application may be outdated. Please contact me and let me know whether you choose to proceed with the application process.

Sincerely,

*A Cornacch*

Susan Cornacchio, RN, JD
Board Counsel
Physician Health & Compliance Unit

BRM0104

# EXHIBIT 16

**Commonwealth of Massachusetts Board of Registration in Medicine**
560 Harrison Avenue, Suite #G-4, Boston, MA  02118 - www.massmedboard.org

## CHANGE OF PROGRAM APPLICATION

**IMPORTANT:** Please read accompanying instructions before completing the application and print legibly. Sections A and B must be completed by the applicant.  Attach check for $100.00 made payable to Commonwealth of Massachusetts.

**SECTION A: To be completed by applicant.**

1.  Name: (Last) BADGAIYAN          (First) RAJENDRA        (MI) A

2.  Mailing Address: 122 A SYCAMORE STR.  Telephone Number: 617 - 623 - 1140

    City: SOMERVILLE          State: MA      Zip: 02145

3.  Name of Training Program: JOINT PROGRAM IN NUCLEAR MEDICINE

4.  Name of Medical School: GANDHI MEDICAL COLLEGE BHOPAL, INDIA    Year Graduated: 1978

5-A  Current Limited License Number: 7980

| **Previous Training Programs:** List previous license numbers, training institutions and programs involved: | | | | |
|---|---|---|---|---|
| License Number | Training Program | Location | From | To |
| 7980 | HARVARD SOUTHSHORE PSYCHIATRY RESIDENCY | BROCKTON VAHC | 10/1991 | 12/03 |
| | | | / / | / / |

**Other State Licenses:** List states (abbreviations) where you are currently licensed to practice medicine (include residency training licenses). Indicate whether full license (F) or residency or limited license (L).

_____ ☐(F)☐(L)    _____ ☐(F)☐(L)    _____ ☐(F)☐(L)    _____ ☐(F)☐(L)

5-B.  Was your previous training a prerequisite for entering this program?    YES ☒    NO ☐

5-C.  Did you complete your previous training program(s)?    YES ☒    NO ☐

If you answered "no" to 5-B or 5-C, attach an explanation detailing your reasons for not completing previous program(s). The program director must provide a letter certifying the circumstances under which you left the training program and complete the enclosed Evaluation Form  The letter and Evaluation form must be placed in an envelope by the program director and sealed and signed across the seal.  If the seal on the envelope is broken , it will be returned to the applicant and then the  process must be repeated.

## THIS SECTION MUST BE COMPLETED BY THE CURRENT PROGRAM DIRECTOR

Has the physician been subject to past or pending disciplinary action in this program? YES☐    NO ☐
See previously submitted application for permanent license
I hereby certify that the above-named physician is in good standing in the Residency/Fellowship as indicated.

Type or Print Name and Title GRACE J. MUSHRUSH, M.D.    Date: 08/12/04
(Job)
Signature of Program Director Grace J Mushrush, MD    Telephone: 583-4500
X2457

BRM0072

# EXHIBIT 17

# Commonwealth of Massachusetts
# Board of Registration in Medicine

560 Harrison Avenue, G-4
Boston, Massachusetts 02118
(617) 654-9800

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

Enforcement Division Fax: (617) 451-9568
Legal Division Fax: (617) 357-8450
Licensing Division Fax: (617) 426-9358

**MARTIN CRANE, MD**
BOARD CHAIR

**NANCY ACHIN AUDESSE**
EXECUTIVE DIRECTOR

January 20, 2005

**VIA FAX AND REGULAR MAIL**

Paul Cirel, Esquire
Dwyer and Collora, LLP
600 Atlantic Avenue
Boston, Massachusetts 02210

Re: Rajendra D. Badgaiyan, M.D.

Dear Attorney Cirel:

On January 19, 2005, the Licensing Committee, a subcommittee of the Board of Registration in Medicine, reviewed Dr. Badgaiyan's Change of Program Application for a limited license. The Committee recommended that Dr. Badgaiyan's application be approved contingent on his entering into a Letter of Agreement (LOA) with the Board's Complaint Committee.

As you know, a LOA is a private agreement between Dr. Badgaiyan and the Committee. It is not considered a disciplinary agreement and is not reported to the national data reporting systems. However, a LOA does provide for disclosure of the Agreement to the physician's employer and to any in- or out-of-state health maintenance organization with which he has privileges or any other kind of association.

Enclosed is a draft of a LOA for Dr. Badgaiyan. Please provide a list of the facilities where he will be working as well as letter from Dr. Treves indicating that he has read the draft Agreement and is willing to assume the associated monitoring and reporting responsibilities. When I have received this information, Dr. Badgaiyan's matter will be scheduled for an upcoming Complaint Committee meeting.

BRM0105

Paul Cirel, Esquire
January 20, 2005
Page Two

Please call me at (617) 654-9861 if I can be of any assistance.

Sincerely,

Rebecca I. Lockwood
Physician Health and Compliance Counsel

BRM0106

# EXHIBIT 18

**Rajendra D. Badgaiyan, M.D.**
Assistant Professor of Radiology
Harvard Medical School
Massachusetts General Hospital

Phone: (617) 724-1793
Fax:   (617) 726-6165
E-mail: rajendra@wjh.harvard.edu

February 11, 2005

The Members of the Board,
Massachusetts Board of Registration in Medicine
Boston.

RE: Full and Limited License applications.

Dear Members of the Board,

My limited license application for a change of program is under consideration of the board for the past several months. I am told that the application will not be approved unless I agree to sign a five-year monitoring contract. I request you to waive this requirement for the following reasons:

1. I am in a residency training program in Nuclear Medicine where I am being closely monitored by the program director and the faculty.

2. My competency to practice medicine has not been questioned by anybody. All of my supervisors, previous program director, and Dr Donald Meyer, MD (who has evaluated me) have expressed their confidence in my competency to practice medicine.

3. I do not have any physical or mental condition that requires intensive monitoring or therapeutic intervention. During residency training I was evaluated by more than 30 psychiatrists who have observed me closely for extended period of time (some of them for more than a year). Nobody has suggested that I have a physical or mental condition that will make me impaired and will require monitoring.

4. In all possibility, my application for full license would have been approved several months ago, if my previous program director had not given misleading statement to the board regarding my 'probationary' status.

5. The problem that I had during previous residency training was a result of a discriminatory work environment, and is not likely to happen again. Dr Meyer has elaborated some of the issues that lead to my problems and is obvious from the claims concerning my 'probation' at the Harvard South Shore Residency Training Program (please see my letter of 4/26/04). I have been working in Massachusetts General Hospital for the past six years and never had any problem. My supervisors in the MGH have not only promoted me to the position of an Assistant Professor but went out of the way to help me when they came to know about my difficulty in getting the license. I was offered a residency position and I have been allowed to stay in the

BRM0109

program for more than seven months even though it has caused considerable disruption in clinical activities of the program because of my inability to carry out clinical work.

6.  In my opinion, the monitoring contract stipulated by the board will be counter productive because it requires me to attend therapy, monitoring and group sessions at least six times a month. Since these sessions will involve traveling to different locations in and around Boston during normal duty hours of the residency program, it will significantly affect my clinical and academic responsibilities besides causing disruption in the training.

7.  Because in addition to clinical duties I will have to spend considerable amount of time on research (as an NIH Principal Investigator), the time spent in monitoring (about 20 hours a month) will adversely affect my research activities. Since I am primarily interested in developing a research career, it will severely damage my future academic career besides causing significant physical and mental stress.

8.  There has not been any complaint or claims against me even though I have been licensed to practice medicine in India (full license) for over 25 years and in Massachusetts (limited license) for over 5 years.

If the board has any doubt about my competency to practice medicine, I can request Dr Kirshner (as recommended by Dr Meyer on page 4 of his evaluation), the chief of service, or the program director, to monitor my performance and report to the board.

I also request you to consider my full license application which is on hold for a year. Full license will allow me to work on psychiatric patients for my research. Because I do not have a full license I have not been able to start many of my research projects on psychiatric population.

I therefore request the members of the board to waive the monitoring requirements and help me advance my academic career. I will be very much obliged for this favor.

Sincerely,

Rajendra D Badgaiyan
122A, Sycamore Street
Somerville, MA 02145

220301



# Commonwealth of Massachusetts
# BOARD OF REGISTRATION IN MEDICINE

560 Harrison Avenue, G-4
Boston, Massachusetts 02118
(617) 654-9800

**MITT ROMNEY**
*GOVERNOR*

**KERRY HEALEY**
*LIEUTENANT GOVERNOR*

Enforcement Division Fax: (617) 451-9568
Legal Division Fax: (617) 357-8453
Licensing Division Fax: (617) 426-9358

**MARTIN CRANE, MD**
*BOARD CHAIR*

**NANCY ACHIN AUDESSE**
*EXECUTIVE DIRECTOR*

## MEMORANDUM

**TO:**     Rajendra Badgaiyan

**FROM:**   The Licensing Division

**DATE:**   February 9, 2006

**RE:**     6 MONTH UPDATE – FULL LICENSE APPLICATION

Your full license application has been in process for over 6 months and must be updated.  If you **do not** wish to continue to pursue your application, please notify the Board, in writing, within 30 days of receipt of this letter.  There are no additional fees required.

If you wish to continue to pursue your application for a full license, you may go to the Board's website at www.massmedboard.org, select "Services for Physicians", then "Full License Application" and  "Downloadable application kits for full license" and print the following forms:

☑ Initial Application
☑ Authorization Release Form
☑ Supplement Form
☑ Medicare Tax Form
☑ License Verifications from each state for current or past Full Licenses:
☑ Evaluation Form
☑ AMA Physician Profile
☑ National Practitioner Data Bank Report
☑ Malpractice History Form _____

☐ Reports from following carriers:  _____
                                     _____
                                     _____
                                     _____

☑ Other documents:  Need to document your activities, clinical and or other since you completed your post graduate training.

NOTES: _____
       _____
       _____
       _____

E/share/6months

BRM0112

# EXHIBIT 19



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**LYONS, NEW JERSEY 07939**

**EEO COUNSELOR'S REPORT**

**CASE NUMBER:** 200G-0525-2002104727          **COUNSELOR'S NAME:** Jacqueline M. Vélez

| | |
|---|---|
| Name of Aggrieved Employee: | Rajendra Badgaiyan, M.D. |
| Home Address: | 122 A Sycamore Street, Somerville, MA 02145 |
| Home Telephone Number: | 617-623-1140 |
| Business Address: | 940 Belmont Street, Brockton MA 02301 |
| Business Telephone Number: | 508-583-4500 x2456 |
| Employee [ X ] | Former Employee [ ]          Job Applicant [ ] |
| Position Title/Series/Grade: | |
| Title 5 [ ]     Title 38 [ X ] | Hybrid T38 [ ]   Full Time [ X ]   Part Time [ ] |
| Temporary [ ]   Probationary [ ] | Career Conditional [ ]   Career [ ]   Term [ ] |
| Name of Facility: | VABHCS – Brockton Facility |
| Service/Section: | Psychiatry |
| Address of Facility: | 940 Belmont Street, Brockton MA 02301 |
| Facility Telephone Number: | 508-583-4500 x2456 |
| Name of Representative: | Attorney: Yes[ ] No[ ] |
| Representative's Address: | |
| Representative's Telephone: | |

**NOTIFICATION OF PROCEDURAL RIGHTS**

| | | | | |
|---|---|---|---|---|
| Initial Contact (Date): | 08/29/2002 | | | |
| Initial Interview (Date): | 08/29/2002 | | | |
| Rights, Waiver & Claim Letter: | Mailed (FedEx): | 08/29/2002 | Rec'd: | 08/30/2002 |
| Agreed to Waive Anonymity: | YES   [ X ] | NO   [ ] | | |
| Notification to Facility: | Mailed | 09/11/2002 | | |
| ADR Offered: | YES   [ X ] | NO   [ ] | Date: | 08/29/2002 |
| ADR Agreed To: | YES   [ ] | NO   [ X ] | Date: | 08/29/2002 |
| ADR Agreement: | Mailed/Faxed: | | Rec'd: | |
| Extension (Non-ADR): | Mailed/Faxed: | | Rec'd: | |
| Release of Medical Information: | Mailed/Faxed: | | Rec'd: | |
| Settlement Agreement: | YES   [ ] | NO   [ ] | Date: | |
| Notice of Right to File: | Mailed/Faxed: | 09/23/2002 | Rec'd: | 09/24/2002 |

Revised 05/29/02

Name of Aggrieved Employee: ⬤jendra D. Badgaiyan    ⬤
Name of Facility: VABHCS – Brockton Facility
Date of Initial Contact: August 29, 2002

| BASIS(ES) | CLAIM(S) | EVIDENCE AND DATE(S) OF OCCURRENCE | RESOLUTION(S) SOUGHT |
|---|---|---|---|
| National Origin (India) | Denial of Promotion | The aggrieved party received a letter dated May 28, 2002 that stated that he would not be promoted to PGY – IV in October 2002. | 1. Rescind letter dated May 28, 2002.<br>2. Remove on all adverse information in his personnel file.<br>3. Monetary compensation for physical and mental stress. |

- On August 29, 2002 the aggrieved party contacted the Office of Resolution Management and spoke with this counselor who completed an initial referral form and initial interview.

- The Notice of Rights and Responsibilities (NORR) was sent to the aggrieved party via overnight mail (FedEx) on August 29, 2002 and was confirmed as received by the aggrieved party on August 30, 2002.

- Telephonic interviews were conducted with the aggrieved party on August 30, September 4, 5 and 9, 2002 at his home phone number to advise him that fact-facing had not occurred because he had not returned his NORR. This counselor also informed the aggrieved party that during the informal process, timeframes are of the utmost importance noting informal counseling has a 30-day timeframe starting at the date of initial contact (August 29, 2002).

- On September 11, 2002 this counselor received a signed copy of the aggrieved party's NORR in which he waived his right to anonymity.

- On September 11, September 12, September 13, 2002 and September 16, 2002 this counselor attempted to contact Ms. Sharon O'Leary, EEO Program Manager at her work phone number to request copy of the aggrieved party's EEO training records and to discuss the aggrieved party's claim in order to seek resolution at the informal level, but was unable to reach her.

- On September 16, 2002 this counselor attempted to contact Human Resources Management Specialist Officials and Grace Mushrush, M.D., Director of Residency Training but was unable to reach them.

- Telephonic interviews were conducted with the Responsible Management Official, Dr. Grace Mushrush on September 17 and September 19, 2002.

- Telephonic interviews were conducted with Sharon O'Leary, EEO Program Manager on September 18 and September 23, 2002.

Below is a description of the claim(s) and resolution(s) as presented by the Aggrieved Employee:

2

Name of Aggrieved Employee: Rajendra D. Badgaiyan
Name of Facility: VABHCS – Brockton Facility
Date of Initial Contact: August 29, 2002

| Claim #1: | Denial of Promotion |
|---|---|
| Evidence and Date(s) of Occurrence: | The aggrieved party received a letter dated May 28, 2002 that stated he was not recommended for a promotion to PGY – IV on October 2002. |
| Basis(es): | National Origin (India) |
| Responding Management Official(s): | |
| Mixed Case Issue:        [  ] Yes  [ X ] No | |
| MSPB Filed:        [  ] Yes  [ X ] No | |
| Union Grievance Filed:        [  ] Yes  [ X ] No | |

## Brief Description of Claim:

The aggrieved employee contacted the Office of Resolution Management on August 29, 2002 because he believed he was discriminated against based on his national origin (India) when he received a letter dated May 28, 2002 with the Psychiatry Residency Training Program Committee recommendations of not promoting him to his next level (PSY-14) in October 2002. When asked by this counselor why he felt he was discriminated based on his nationality, the aggrieved party said that he was the only Psychiatry Resident not promoted to the next level.

The aggrieved party's claim was beyond the 45-day requirement for contacting an EEO Counselor. This counselor explained to the aggrieved party his rights and responsibilities and the timeframe for contacting EEO Officials. The aggrieved party said that the reason for waiting before contacting an EEO Official was that he was too depressed and too emotional for him to address his claim in a timely fashion. When asked by this counselor if the he attended EEO Training, the aggrieved party stated that he does not remember if he attended the training.

## Counselor Notes:
This Counselor contacted Ms. Sharon O'Leary, EEO Specialist for the VACHCS on September 18 and September 23, 2002 to request a copy of the aggrieved party's EEO training records. This Counselor also contacted Human Resources Management Officials on September 25, 2002 to request a copy of the aggrieved party's EEO training record. To date this counselor has not received the aggrieved party's training records.

---

## Documents Suggested for Review:

By the aggrieved party:
- Letter addressed to this counselor dated September 4, 2002.
- Questionnaire dated September 4, 2002.
- Psychiatry Residency Training Program Committee recommendation letter dated May 28, 2002.

By the responsible management officials:

- Report of Contact dated September 13, 2002
- Report of Contact dated September 10, 2002
- E-mail dated August 27, 2002
- E-mail dated July 8, 2002
- E-mail dated July2, 2002

3

Name of Aggrieved Employee: ⬤jendra D. Badgaiyan                    ⬤
Name of Facility: VABHCS – Brockton Facility
Date of Initial Contact: August 29, 2002

- E-mail dated June 30, 2002
- E-mail dated June 24, 2002
- Letter dated May 28, 2002
- E-mail dated May 17, 2002
- April 26, 2002 Minutes for the Psychiatry Residency Training committee dated May 5, 2002.
- Letter dated May 8, 2002
- Report of contact dated April 26, 2002
- Letter of Complaint dated April 3, 2002
- E-mail dated April 1, 2002
- Report of contact, undated
- E-mail dated March 4, 2002
- Aggrieved party's preceptor evaluation of Trainee from July 2001 to August 2001.
- Aggrieved party's preceptor evaluation of Trainee for March 2001.


**Witness(es) Suggested for Interview: None**


**Resolution Sought:** The aggrieved party requested the following:
- Withdraw Letter dated May 28, 2002.
- Remove all adverse information in his personnel record.
- Provide monetary compensation for physical and mental stress resulting in the increase of his blood pressure to a life threatening level.


**Responding Management Official Contacted:** Grace Mushrush, M.D., Director, Residency Program, Psychiatry, 508-583-4500 x2456.

**Response to Claim #1:**

Dr. Mushrush was provided information related to the EEO Discrimination Complaint process and the role of the EEO Counselor. She was advised of her right to representation. She stated she did not feel a representative was necessary during our discussion. Dr. Mushrush was informed of the aggrieved party's allegation of discrimination and resolution sought.

Dr. Mushrush said that the aggrieved party's anniversary date for promotion would be in October, therefore he could not be promoted with the other residents last July 2002. Dr. Mushrush also said that for a resident to be promoted to the next level he/she would need to meet the requirements for the promotion and the aggrieved party did not meet these requirements.

Dr. Mushrush explained to this counselor that the Residency Training Program Committee held a meeting in April 26, 2002 to discuss the residents' promotion to their next level. In the meeting the committee members also reviewed the aggrieved party's training experience and performance. She said that it was noted that there were numerous complaints concerning the aggrieved party's poor attitude and lack of cooperation in addition to the aggrieved party's need to complete additional training, which she noted would be extended until December 2002. She said that the Committee would meet sometime in December, 2002 to evaluate the

4

Name of Aggrieved Employee: ⬤jendra D. Badgaiyan    ⬤
Name of Facility: VABHCS – Brockton Facility
Date of Initial Contact: August 29, 2002

aggrieved party's performance.

Dr. Mushrush stated that the aggrieved party's not being promoted to a PGY-IV was not based on his nationality. She said that based on the evidence presented to the Committee members the aggrieved party could not be considered for a promotion in July, 2002 because he did not met the time in grade requirements. She also stated he was not recommended for a promotion in October, 2002 because he needed to complete additional training, which was explained to the aggrieved party in the letter given to him on May 28, 2002.

**Witness(es) suggested by Responding Management Official to Interview: None**

**Response to Resolution Sought by Aggrieved Employee:** The RMO said that based on the evidence file the Psychiatry Residency Training Program Committee could not promote the aggrieved party to his next level (PGY-IV). The aggrieved party's resolution was not achievable at this stage.

**Proposed Alternative Resolution: None**

**Results of Witness Interviews: N/A**

**Summary of Resolution Efforts: None**

**FINAL INTERVIEW**

On September 23, 2002, the results of resolution efforts and the following claim were discussed with the Aggrieved Employee:

Claim #1: Whether the aggrieved party was discriminated against based on his nationality (India) when he received a Letter on May 28, 2002 from the Psychiatry Residency Training Program Committee that recommended his promotion be held until the committee met in December, 2002 to re-evaluate his work performance.

The Aggrieved Employee was informed that the claim listed above was the only claim addressed during the informal EEO counseling and, if a formal EEO Complaint of Discrimination is filed, claims not discussed with me may not be accepted for formal complaint processing.

The Notice of Right to File a Discrimination Complaint and Form 4939 were sent by overnight mail (FedEx) on September 23, 2002 and was received by the aggrieved employee on September 24, 2002

_____          10/4/02
EEO Counselor                    Date

5

# EXHIBIT 20

## Westlaw.

126 S.Ct. 2405                                                                 Page 1

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

**H**
Briefs and Other Related Documents

Supreme Court of the United States
BURLINGTON NORTHERN & SANTA FE
RAILWAY CO., Petitioner,
v.
Sheila WHITE.
**No. 05-259.**

Argued April 17, 2006.
Decided June 22, 2006.

**Background:** Employee of railroad brought Title
VII action against railroad, alleging sex
discrimination and retaliation. The United States
District Court for the Western District of
Tennessee, Jon P. McCalla, J., entered judgment on
jury verdict for employee on retaliation claim and
against employee on sex discrimination and
punitive damages claims, and denied railroad's
motion for judgment as a matter of law. The United
States Court of Appeals for the Sixth Circuit, 310
F.3d 443, reversed in part and remanded. On
rehearing en banc, the Court of Appeals, 364 F.3d
789, affirmed denial of judgment as a matter of law,
but remanded as to punitive damages. Certiorari
was granted.

**Holdings:** The United States Supreme Court,
Justice Breyer, held that:

1(1) application of Title VII retaliation provision is
not limited to employer's employment-related or
workplace actions, abrogating *Von Gunten v.
Maryland,* 243 F.3d 858, *Robinson v. Pittsburgh,*
120 F.3d 1286, *Mattern v. Eastman Kodak Co.,* 104
F.3d 702, and *Manning v. Metropolitan Life Ins.
Co.,* 127 F.3d 686;

2(2) retaliation provision contains materiality
requirement and objective standard;

3(3) whether reassignment of duties constituted
materially adverse action was jury question; and

6(4) whether 37-day suspension constituted
materially adverse action also was jury question.

Affirmed.

Justice Alito filed opinion concurring in the
judgment.

West Headnotes

**[1] Civil Rights 78 ⬅1245**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1245 k. Adverse Actions in General.
Most Cited Cases
Application of Title VII retaliation provision is not
limited to employer's actions that affect terms,
conditions or status of employment, or those that
occur at workplace, i.e. scope of retaliation
provision is broader than that of Title VII's
substantive discrimination provision; abrogating
*Von Gunten v. Maryland,* 243 F.3d 858; *Robinson
v. Pittsburgh,* 120 F.3d 1286; *Mattern v. Eastman
Kodak Co.,* 104 F.3d 702; *Manning v. Metropolitan
Life Ins. Co.,* 127 F.3d 686. Civil Rights Act of
1964, §§ 703(a), 704(a), 42 U.S.C.A. §§ 2000e-2(a)
, 2000e-3(a).

**[2] Civil Rights 78 ⬅1245**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1245 k. Adverse Actions in General.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                              Page 2

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op. Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

Most Cited Cases
Title VII retaliation provision contains materiality requirement and objective standard; thus, provision requires showing that reasonable employee would have found employer's challenged action materially adverse, i.e. that challenged action could well dissuade reasonable employee from protected conduct. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

### [3] Civil Rights 78 ⊂⊃1555

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
Whether reassignment of railroad employee from forklift operator to track labor duties rose to level of materially adverse employer action was for jury, in employee's Title VII retaliation action, given evidence that forklift operator position had higher prestige, was considered better job, and was less arduous than track laborer position. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

### [4] Civil Rights 78 ⊂⊃1245

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1245 k. Adverse Actions in General. Most Cited Cases
Reassignment of duties can potentially constitute retaliatory discrimination within scope of Title VII retaliation provision, even though unaccompanied by demotion; whether reassignment rises to level of retaliation depends on whether it is materially adverse to reasonable employee. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

### [5] Civil Rights 78 ⊂⊃1248

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1248 k. Discipline. Most Cited Cases

### Civil Rights 78 ⊂⊃1583(2)

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1578 Relief from Retaliation
            78k1583 Monetary Relief
                78k1583(2) k. Back Pay or Lost Earnings. Most Cited Cases
Fact that employer that had suspended employee without pay during investigation into insubordination charge had later reinstated employee with back pay, on finding of no insubordination, did not, by itself, preclude employee's obtaining compensatory damages under Title VII retaliation provision. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

### [6] Civil Rights 78 ⊂⊃1555

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
Whether 37-day unpaid investigatory suspension of employee, later rescinded with back pay, rose to level of materially adverse employer action, was for jury, in employee's Title VII retaliation action; reasonable employee could have found like period of time without paycheck to be serious hardship that would act as deterrent to protected activity. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

*2406 Syllabus FN*

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), and its anti-retaliation provision forbids

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                                        Page 3

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

"discriminat [ion] against" an employee or job applicant who, *inter alia,* has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation, § 2000e-3(a). Respondent White, the only woman in her department, operated the forklift at the Tennessee Yard of petitioner Burlington Northern & Santa Fe Railway Co. (Burlington). After she complained, her immediate supervisor was disciplined for sexual harassment, but she was removed from forklift duty to standard track laborer tasks. She filed a complaint with the Equal Employment Opportunity Commission (EEOC), claiming that the reassignment was unlawful gender discrimination and retaliation for her complaint. Subsequently, she was suspended without pay for insubordination. Burlington later found that she had not been insubordinate, reinstated her, and awarded her backpay for the 37 days she was suspended. The suspension led to another EEOC retaliation charge. After exhausting her administrative remedies, White filed an action against Burlington in federal court claiming, as relevant here, that Burlington's actions in changing her job responsibilities and suspending her for 37 days amounted to unlawful retaliation under Title VII. A jury awarded her compensatory damages. In affirming, the Sixth Circuit applied the same standard for retaliation that it applies to a substantive discrimination offense, holding that a retaliation plaintiff must show an " adverse employment action," defined as a " materially adverse change in the terms and conditions" of employment. The Circuits have come to different conclusions about whether the challenged action has to be employment or workplace related and about how harmful that action must be to constitute retaliation.

*Held:*

1. The anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. The language of the substantive and anti-retaliation provisions differ in important **\*2407** ways. The terms "hire," "discharge," "compensation, terms, conditions, or privileges of employment," " employment opportunities," and "status as an

employee" explicitly limit the substantive provision's scope to actions that affect employment or alter workplace conditions. The anti-retaliation provision has no such limiting words. This Court presumes that, where words differ as they do here, Congress has acted intentionally and purposely. There is strong reason to believe that Congress intended the differences here, for the two provisions differ not only in language but also in purpose. The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their status, while the anti-retaliation provision seeks to prevent an employer from interfering with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. To secure the first objective, Congress needed only to prohibit employment-related discrimination. But this would not achieve the second objective because it would not deter the many forms that effective retaliation can take, therefore failing to fully achieve the anti-retaliation provision's purpose of " [m]aintaining unfettered access to statutory remedial mechanisms," *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808. Thus, purpose reinforces what the language says, namely, that the anti-retaliation provision is not limited to actions affecting employment terms and conditions. Neither this Court's precedent nor the EEOC's interpretations support a contrary conclusion. Nor is it anomalous to read the statute to provide broader protection for retaliation victims than for victims of discrimination. Congress has provided similar protection from retaliation in comparable statutes. And differences in the purpose of the two Title VII provisions remove any perceived "anomaly," for they justify this difference in interpretation. Pp. 2411-2414.

2. The anti-retaliation provision covers only those employer actions that would have been materially adverse to a reasonable employee or applicant. This Court agrees with the Seventh and District of Columbia Circuits that the proper formulation requires a retaliation plaintiff to show that the challenged action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Rochon v. Gonzales,* 438 F.3d 1211, 1219. The Court refers to *material*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                    Page 4

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

adversity to separate significant from trivial harms.
The anti-retaliation provision seeks to prevent
employer interference with "unfettered access" to
Title VII's remedial mechanisms by prohibiting
employer actions that are likely to deter
discrimination victims from complaining to the
EEOC, the courts, and employers. *Robinson,
supra,* at 346, 117 S.Ct. 843. The Court refers to a
*reasonable* employee's reactions because the
provision's standard for judging harm must be
objective, and thus judicially administrable. The
standard is phrased in general terms because the
significance of any given act of retaliation may
depend upon the particular circumstances. Pp.
2414-2416.

3. Applying the standard to the facts of this case,
there was a sufficient evidentiary basis to support
the jury's verdict on White's retaliation claim.
Contrary to Burlington's claim, a reassignment of
duties can constitute retaliatory discrimination
where both the former and present duties fall within
the same job description. Almost every job
category involves some duties that are less desirable
than others. That is presumably why the EEOC has
consistently recognized retaliatory work
assignments as forbidden retaliation. Here, the jury
had considerable evidence that the track laborer
**\*2408** duties were more arduous and dirtier than
the forklift operator position, and that the latter
position was considered a better job by male
employees who resented White for occupying it.
Based on this record, a jury could reasonably
conclude that the reassignment would have been
materially adverse to a reasonable employee.
Burlington also argues that the 37-day suspension
without pay lacked statutory significance because
White was reinstated with backpay. The
significance of the congressional judgment that
victims of intentional discrimination can recover
compensatory and punitive damages to make them
whole would be undermined if employers could
avoid liability in these circumstances. Any
insufficient evidence claim is unconvincing. White
received backpay, but many reasonable employees
would find a month without pay a serious hardship.
White described her physical and emotional
hardship to the jury, noting that she obtained

medical treatment for emotional distress. An
indefinite suspension without pay could well act as
a deterrent to the filing of a discrimination
complaint, even if the suspended employee
eventually receives backpay. Thus, the jury's
conclusion that the suspension was materially
adverse was reasonable. Pp. 2416-2418.

364 F.3d 789, affirmed.

BREYER, J., delivered the opinion of the Court, in
which ROBERTS, C.J., and STEVENS, SCALIA,
KENNEDY,        SOUTER,        THOMAS,       and
GINSBURG, JJ., joined. ALITO, J., filed an
opinion concurring in the judgment.

Gregory G. Garre for the United States as amicus
curiae, by special leave of Court.
James H. Gallegos, Lawrence M. Stroik, David M.
Pryor, Fort Worth, TX, Bryan P. Neal, Thompson
& Knight LLP, Dallas, TX, Carter G. Phillips,
Counsel of Record, Stephen B. Kinnaird, Eric A.
Shumsky, Sidley Austin LLP, Washington, D.C.,
Ralph T. Gibson, Bateman Gibson, LLC, Memphis,
TN, for Petitioner.
Donald A. Donati, Counsel of Record, William B.
Ryan, Donati Law Firm, LLP, Memphis, TN, Eric
Schnapper,    School   of   Law,   University   of
Washington, Seattle, WA, for Respondent.For U.S.
Supreme Court briefs, see:2006 WL 704480
(Pet.Brief)2006 WL 622126 (Resp.Brief)2006 WL
937535     (Reply.Brief)2006    WL      690256
(Resp.Supp.Brief)
Justice BREYER delivered the opinion of the Court.
Title VII of the Civil Rights Act of 1964 forbids
employment discrimination against "any individual"
based on that individual's "race, color, religion, sex,
or national origin." Pub.L. 88-352, § 704, 78 Stat.
257, as amended, 42 U.S.C. § 2000e-2(a). A
separate section of the Act-its anti-retaliation
provision-forbids     an    employer    from    "
discriminat[ing] against" an employee or job
applicant because that individual "opposed any
practice" made unlawful by Title VII or "made a
charge, testified, assisted, or participated in" a Title
VII proceeding or investigation. § 2000e-3(a).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                    Page 5

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

The Courts of Appeals have come to different conclusions about the scope of the Act's anti-retaliation provision, particularly the reach of its phrase "discriminate against." Does that provision confine actionable retaliation to activity that affects the terms and conditions of employment? And how harmful must the adverse actions be to fall within its scope?

**\*2409** We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

I

A

This case arises out of actions that supervisors at petitioner Burlington Northern & Santa Fe Railway Company took against respondent Sheila White, the only woman working in the Maintenance of Way department at Burlington's Tennessee Yard. In June 1997, Burlington's roadmaster, Marvin Brown, interviewed White and expressed interest in her previous experience operating forklifts. Burlington hired White as a "track laborer," a job that involves removing and replacing track components, transporting track material, cutting brush, and clearing litter and cargo spillage from the right-of-way. Soon after White arrived on the job, a co-worker who had previously operated the forklift chose to assume other responsibilities. Brown immediately assigned White to operate the forklift. While she also performed some of the other track laborer tasks, operating the forklift was White's primary responsibility.

In September 1997, White complained to

Burlington officials that her immediate supervisor, Bill Joiner, had repeatedly told her that women should not be working in the Maintenance of Way department. Joiner, White said, had also made insulting and inappropriate remarks to her in front of her male colleagues. After an internal investigation, Burlington suspended Joiner for 10 days and ordered him to attend a sexual-harassment training session.

On September 26, Brown told White about Joiner's discipline. At the same time, he told White that he was removing her from forklift duty and assigning her to perform only standard track laborer tasks. Brown explained that the reassignment reflected co-worker's complaints that, in fairness, a " 'more senior man' " should have the "less arduous and cleaner job" of forklift operator. 364 F.3d 789, 792 (C.A.6 2004) (case below).

On October 10, White filed a complaint with the Equal Employment Opportunity Commission (EEOC or Commission). She claimed that the reassignment of her duties amounted to unlawful gender-based discrimination and retaliation for her having earlier complained about Joiner. In early December, White filed a second retaliation charge with the Commission, claiming that Brown had placed her under surveillance and was monitoring her daily activities. That charge was mailed to Brown on December 8.

A few days later, White and her immediate supervisor, Percy Sharkey, disagreed about which truck should transport White from one location to another. The specific facts of the disagreement are in dispute, but the upshot is that Sharkey told Brown later that afternoon that White had been insubordinate. Brown immediately suspended White without pay. White invoked internal grievance procedures. Those procedures led Burlington to conclude that White had *not* been insubordinate. Burlington reinstated White to her position and awarded her backpay for the 37 days she was suspended. White filed an additional retaliation charge with the EEOC based on the suspension.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

### *2410 B

After exhausting administrative remedies, White filed this Title VII action against Burlington in federal court. As relevant here, she claimed that Burlington's actions-(1) changing her job responsibilities, and (2) suspending her for 37 days without pay-amounted to unlawful retaliation in violation of Title VII. § 2000e-3(a). A jury found in White's favor on both of these claims. It awarded her $43,500 in compensatory damages, including $3,250 in medical expenses. The District Court denied Burlington's post-trial motion for judgment as a matter of law. See Fed. Rule Civ. Proc. 50(b).

Initially, a divided Sixth Circuit panel reversed the judgment and found in Burlington's favor on the retaliation claims. 310 F.3d 443 (2002). The full Court of Appeals vacated the panel's decision, however, and heard the matter en banc. The court then affirmed the District Court's judgment in White's favor on both retaliation claims. While all members of the en banc court voted to uphold the District Court's judgment, they differed as to the proper standard to apply. Compare 364 F.3d, at 795-800, with *id.*, at 809 (Clay, J., concurring).

### II

Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee (or job applicant) because he has " opposed" a practice that Title VII forbids or has " made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." § 2000e-3(a). No one doubts that the term " discriminate against" refers to distinctions or differences in treatment that injure protected individuals. See *Jackson v. Birmingham Bd. of Ed.,* 544 U.S. 167, 174, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion); see also 4 Oxford English Dictionary 758 (2d ed.1989) (def.3b). But different Circuits have come to different conclusions about whether the challenged action has

to be employment or workplace related and about how harmful that action must be to constitute retaliation.

Some Circuits have insisted upon a close relationship between the retaliatory action and employment. The Sixth Circuit majority in this case, for example, said that a plaintiff must show an "adverse employment action," which it defined as a "materially adverse change in the terms and conditions" of employment. 364 F.3d, at 795 (internal quotation marks omitted). The Sixth Circuit has thus joined those Courts of Appeals that apply the same standard for retaliation that they apply to a substantive discrimination offense, holding that the challenged action must "resul[t] in an adverse effect on the 'terms, conditions, or benefits' of employment." *Von Gunten v. Maryland,* 243 F.3d 858, 866 (C.A.4 2001); see *Robinson v. Pittsburgh,* 120 F.3d 1286, 1300 (C.A.3 1997). The Fifth and the Eighth Circuits have adopted a more restrictive approach. They employ an " ultimate employment decisio[n]" standard, which limits actionable retaliatory conduct to acts " 'such as hiring, granting leave, discharging, promoting, and compensating.' " *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (C.A.5 1997); see *Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (C.A.8 1997).

Other Circuits have not so limited the scope of the provision. The Seventh and the District of Columbia Circuits have said that the plaintiff must show that the "employer's challenged action would have been material to a reasonable employee," which in contexts like the present one means that *2411 it would likely have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Washington v. Illinois Dept. of Revenue,* 420 U.S. 658, 662 (C.A.7 2005); see *Rochon v. Gonzales,* 438 F.3d 1211, 1217-1218 (C.A.D.C.2006). And the Ninth Circuit, following EEOC guidance, has said that the plaintiff must simply establish " 'adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.' " *Ray v. Henderson,* 217 F.3d 1234, 1242-1243 (C.A.9 2000). The concurring

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

judges below would have applied this last mentioned standard. 364 F.3d, at 809 (opinion of Clay, J.).

We granted certiorari to resolve this disagreement. To do so requires us to decide whether Title VII's anti-retaliation provision forbids only those employer actions and resulting harms that are related to employment or the workplace. And we must characterize how harmful an act of retaliatory discrimination must be in order to fall within the provision's scope.

A

[1] Petitioner and the Solicitor General both argue that the Sixth Circuit is correct to require a link between the challenged retaliatory action and the terms, conditions, or status of employment. They note that Title VII's substantive anti-discrimination provision protects an individual only from employment-related discrimination. They add that the anti-retaliation provision should be read *in pari materia* with the anti-discrimination provision. And they conclude that the employer actions prohibited by the anti-retaliation provision should similarly be limited to conduct that "affects the employee's 'compensation, terms, conditions, or privileges of employment.' " Brief for United States as *Amicus Curiae* 13 (quoting § 2000e-2(a)(1) ); see Brief for Petitioner 13 (same).

We cannot agree. The language of the substantive provision differs from that of the anti-retaliation provision in important ways. Section 703(a) sets forth Title VII's core anti-discrimination provision in the following terms:
"It shall be an unlawful employment practice for an employer—
"(1) *to fail or refuse to hire or to discharge* any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin; or
"(2) to limit, segregate, or classify his employees or applicants for employment in any way *which would*

*deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee,* because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a) (emphasis added).

Section 704(a) sets forth Title VII's anti-retaliation provision in the following terms:
"It shall be an unlawful employment practice for an employer *to discriminate against* any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e-3(a) (emphasis added).

The underscored words in the substantive provision– "hire," "discharge," "compensation, terms, conditions, or privileges of employment," " employment opportunities," and "status as an employee"-explicitly**2412** limit the scope of that provision to actions that affect employment or alter the conditions of the workplace. No such limiting words appear in the anti-retaliation provision. Given these linguistic differences, the question here is not whether identical or similar words should be read *in pari materia* to mean the same thing. See, *e.g., Pasquantino v. United States,* 544 U.S. 349, 355, n. 2, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005); *McFarland v. Scott,* 512 U.S. 849, 858, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994); *Sullivan v. Everhart,* 494 U.S. 83, 92, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990). Rather, the question is whether Congress intended its different words to make a legal difference. We normally presume that, where words differ as they differ here, " 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

There is strong reason to believe that Congress intended the differences that its language suggests, for the two provisions differ not only in language

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                                 Page 8

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

but in purpose as well. The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800-801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct.

To secure the first objective, Congress did not need to prohibit anything other than employment-related discrimination. The substantive provision's basic objective of "equality of employment opportunities" and the elimination of practices that tend to bring about "stratified job environments," *id.,* at 800, 93 S.Ct. 1817, would be achieved were all employment-related discrimination miraculously eliminated.

But one cannot secure the second objective by focusing only upon employer actions and harm that concern employment and the workplace. Were all such actions and harms eliminated, the anti-retaliation provision's objective would *not* be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace. See, *e.g., Rochon v. Gonzales,* 438 F.3d, at 1213 (FBI retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984, 986 (C.A.10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's "

primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

Thus, purpose reinforces what language already indicates, namely, that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions**\*2413** of employment. Cf. *Wachovia Bank, N.A. v. Schmidt,* 546 U.S. ----, 126 S.Ct. 941, 952, 163 L.Ed.2d 797 (2006) (rejecting statutory construction that would "trea[t] venue and subject-matter jurisdiction prescriptions as *in pari materia*" because doing so would "overloo[k] the discrete offices of those concepts").

Our precedent does not compel a contrary conclusion. Indeed, we have found no case in this Court that offers petitioner or the United States significant support. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), as petitioner notes, speaks of a Title VII requirement that violations involve "tangible employment action" such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.,* at 761, 118 S.Ct. 2257. But *Ellerth* does so only to "identify a class of [hostile work environment] cases" in which an employer should be held vicariously liable (without an affirmative defense) for the acts of supervisors. *Id.,* at 760, 118 S.Ct. 2257; see also *Pennsylvania State Police v. Suders,* 542 U.S. 129, 143, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (explaining holdings in *Ellerth* and *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), as dividing hostile work environment claims into two categories, one in which the employer is strictly liable because a tangible employment action is taken and one in which the employer can make an affirmative defense). *Ellerth* did not discuss the scope of the general anti-discrimination provision. See 524 U.S., at 761, 118 S.Ct. 2257 (using "concept of a tangible employment action [that] appears in numerous cases in the Courts of Appeals" only "for resolution of the vicarious liability issue"). And

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                                    Page 9

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

*Ellerth* did not mention Title VII's anti-retaliation provision at all. At most, *Ellerth* sets forth a standard that petitioner and the Solicitor General believe the anti-retaliation provision ought to contain. But it does not compel acceptance of their view.

Nor can we find significant support for their view in the EEOC's interpretations of the provision. We concede that the EEOC stated in its 1991 and 1988 Compliance Manuals that the anti-retaliation provision is limited to "adverse employment-related action." 2 EEOC Compliance Manual § 614.1(d), p. 614-5 (1991) (hereinafter EEOC 1991 Manual); EEOC Compliance Manual § 614.1(d), p. 614-5 (1988) (hereinafter EEOC 1988 Manual). But in those same manuals the EEOC lists the "[e]ssential [e]lements" of a retaliation claim along with language suggesting a broader interpretation. EEOC 1991 Manual § 614.3(d), pp. 614-8 to 614-9 (complainant must show "that (s)he was in some manner subjected to adverse treatment by the respondent because of the protest or opposition"); EEOC 1988 Manual § 614.3(d), pp. 614-8 to 614-9 (same).

Moreover, both before and after publication of the 1991 and 1988 manuals, the EEOC similarly expressed a broad interpretation of the anti-retaliation provision. Compare EEOC Interpretive Manual, Reference Manual to Title VII Law for Compliance Personnel § 491.2 (1972) (hereinafter 1972 Reference Manual) (§ 704(a) "is intended to provide 'exceptionally broad protection' for protestors of discriminatory employment practices"), with 2 EEOC Compliance Manual § 8, p. 8-13 (1998) (hereinafter EEOC 1998 Manual), available at http:// www.eeoc.gov/policy/docs/ retal.html (as visited June 20, 2006, and available in Clerk of Court's case file) (§ 704(a) "prohibit[s] any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity" ). And the EEOC 1998 *2414 Manual, which offers the Commission's *only* direct statement on the question of whether the anti-retaliation provision is limited to the same employment-related activity covered by the anti-discrimination provision,

answers that question in the negative-directly contrary to petitioner's reading of the Act. *Ibid.*

Finally, we do not accept the petitioner's and Solicitor General's view that it is "anomalous" to read the statute to provide broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect, namely, victims of race-based, ethnic-based, religion-based, or gender-based discrimination. Brief for Petitioner 17; Brief for United States as *Amicus Curiae* 14-15. Congress has provided similar kinds of protection from retaliation in comparable statutes without any judicial suggestion that those provisions are limited to the conduct prohibited by the primary substantive provisions. The National Labor Relations Act, to which this Court has " drawn analogies ... in other Title VII contexts," *Hishon v. King & Spalding,* 467 U.S. 69, 76, n. 8, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), provides an illustrative example. Compare 29 U.S.C. § 158(a)(3) (substantive provision prohibiting employer "discrimination in regard to ... any term or condition of employment to encourage or discourage membership in any labor organization") with § 158(a)(4) (retaliation provision making it unlawful for an employer to "discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter"); see also *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 740, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (construing anti-retaliation provision to "prohibi[t] a wide variety of employer conduct that is intended to restrain, or that has the likely effect of restraining, employees in the exercise of protected activities," including the retaliatory filing of a lawsuit against an employee); *NLRB v. Scrivener,* 405 U.S. 117, 121-122, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972) (purpose of the anti-retaliation provision is to ensure that employees are " 'completely free from coercion against reporting' " unlawful practices).

In any event, as we have explained, differences in the purpose of the two provisions remove any perceived "anomaly," for they justify this difference of interpretation. See *supra,* at 2412. Title VII depends for its enforcement upon the cooperation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op. Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

Page 10

employees who are willing to file complaints and act as witnesses. "Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances." *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Interpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of the Act's primary objective depends.

For these reasons, we conclude that Title VII's substantive provision and its anti-retaliation provision are not coterminous. The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm. We therefore reject the standards applied in the Courts of Appeals that have treated the anti-retaliation provision as forbidding the same conduct prohibited by the anti-discrimination provision and that have limited actionable retaliation to so-called "ultimate employment decisions." See *supra,* at 2410.

### B

[2] The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. As we have explained, the **\*2415** Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation. We agree with the formulation set forth by the Seventh and the District of Columbia Circuits. In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Rochon,* 438 F.3d, at 1219 (quoting *Washington,* 420 F.3d, at 662).

We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth " a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.,* 523

U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ; see *Faragher,* 524 U.S., at 788, 118 S.Ct. 2275 (judicial standards for sexual harassment must " filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' "). An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson,* 519 U.S., at 346, 117 S.Ct. 843. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual § 8, p. 8-13.

We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here. See, *e.g., Suders,* 542 U.S., at 141, 124 S.Ct. 2342 (constructive discharge doctrine); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (hostile work environment doctrine).

We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                    Page 11

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale, supra,* at 81-82, 118 S.Ct. 998. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. Cf., *e.g., Washington, supra,* at 662 (finding flex-time schedule critical to employee with disabled child). A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional *2416 advancement might well deter a reasonable employee from complaining about discrimination. See 2 EEOC 1998 Manual § 8, p. 8-14. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an " act that would be immaterial in some situations is material in others." *Washington, supra,* at 661.

Finally, we note that contrary to the claim of the concurrence, this standard does *not* require a reviewing court or jury to consider "the nature of the discrimination that led to the filing of the charge. " *Post,* at 2420 (ALITO, J., concurring in judgment). Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint. By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.

### III

Applying this standard to the facts of this case, we believe that there was a sufficient evidentiary basis to support the jury's verdict on White's retaliation claim. See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The jury found that two of Burlington's actions amounted to

retaliation: the reassignment of White from forklift duty to standard track laborer tasks and the 37-day suspension without pay.

[3] Burlington does not question the jury's determination that the motivation for these acts was retaliatory. But it does question the statutory significance of the harm these acts caused. The District Court instructed the jury to determine whether respondent "suffered a materially adverse change in the terms or conditions of her employment," App. 63, and the Sixth Circuit upheld the jury's finding based on that same stringent interpretation of the anti-retaliation provision (the interpretation that limits § 704 to the same employment-related conduct forbidden by § 703). Our holding today makes clear that the jury was not required to find that the challenged actions were related to the terms or conditions of employment. And insofar as the jury also found that the actions were "materially adverse," its findings are adequately supported.

[4] First, Burlington argues that a reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description. Brief for Petitioner 24-25. We do not see why that is so. Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. That is presumably why the EEOC has consistently found "[r]etaliatory work assignments" to be a classic and "widely recognized" example of "forbidden retaliation." 2 EEOC 1991 Manual § 614.7, pp. 614-31 to 614-32; see also 1972 Reference Manual § 495.2 (noting Commission decision involving an employer's ordering an employee "to do an unpleasant work assignment in retaliation" for filing racial discrimination complaint); EEOC Dec. No. 74-77, 1974 WL 3847, *4 (Jan. 18, 1974) ("Employers have been enjoined" under Title VII "from imposing *2417 unpleasant work assignments upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                Page 12

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

an employee for filing charges").

To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and " should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Oncale,* 523 U.S., at 81, 118 S.Ct. 998. But here, the jury had before it considerable evidence that the track labor duties were "by all accounts more arduous and dirtier"; that the "forklift operator position required more qualifications, which is an indication of prestige"; and that "the forklift operator position was objectively considered a better job and the male employees resented White for occupying it." 364 F.3d, at 803 (internal quotation marks omitted). Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.

[5] Second, Burlington argues that the 37-day suspension without pay lacked statutory significance because Burlington ultimately reinstated White with backpay. Burlington says that "it defies reason to believe that Congress would have considered a rescinded investigatory suspension with full back pay" to be unlawful, particularly because Title VII, throughout much of its history, provided no relief in an equitable action for victims in White's position. Brief for Petitioner 36.

We do not find Burlington's last mentioned reference to the nature of Title VII's remedies convincing. After all, throughout its history, Title VII has provided for injunctions to "bar like discrimination in the future," *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (internal quotation marks omitted), an important form of relief. Pub.L. 88-352, § 706(g), 78 Stat. 261, as amended, 42 U.S.C. § 2000e-5(g). And we have no reason to believe that a court could not have issued an injunction where an employer suspended an employee for retaliatory purposes, even if that

employer later provided backpay. In any event, Congress amended Title VII in 1991 to permit victims of intentional discrimination to recover compensatory (as White received here) and punitive damages, concluding that the additional remedies were necessary to " 'help make victims whole.' " *West v. Gibson,* 527 U.S. 212, 219, 119 S.Ct. 1906, 144 L.Ed.2d 196 (1999) (quoting H.R.Rep. No. 102-40, pt. 1, pp. 64-65 (1991), U.S.Code Cong. & Admin.News 1991, pp. 549, 602-603); see 42 U.S.C. §§ 1981a(a)(1), (b). We would undermine the significance of that congressional judgment were we to conclude that employers could avoid liability in these circumstances.

[6] Neither do we find convincing any claim of insufficient evidence. White did receive backpay. But White and her family had to live for 37 days without income. They did not know during that time whether or when White could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship. And White described to the jury the physical and emotional hardship that 37 days of having "no income, no money" in fact caused. 1 Tr. 154 (" That was the worst Christmas I had out of my life. No income, no money, and that made all of us feel bad. ... I got very depressed"). Indeed, she obtained medical treatment for her emotional distress. A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay. **\*2418** Cf. *Mitchell,* 361 U.S., at 292, 80 S.Ct. 332 ("[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions"). Thus, the jury's conclusion that the 37-day suspension without pay was materially adverse was a reasonable one.

IV

For these reasons, the judgment of the Court of Appeals is affirmed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405    Page 13

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

*It is so ordered.*

Justice ALITO, concurring in the judgment.

I concur in the judgment, but I disagree with the majority's interpretation of the antiretaliation provision of Title VII of the Civil Rights Act of 1964, 78 Stat. 257, § 704(a), as amended, 42 U.S.C. § 2000e-3(a). The majority's interpretation has no basis in the statutory language and will, I fear, lead to practical problems.

### I

Two provisions of Title VII are important here. Section 703(a) prohibits a broad range of discriminatory employment practices.[FN1] Among other things, § 703(a) makes it unlawful for an employer *"to discriminate against"* any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added).

> FN1. Section 703(a) states in pertinent part:
> "It shall be an unlawful employment practice for an employer-
> "(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate against* any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> "(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (emphasis added).

A complementary and closely related provision, § 704(a), makes it unlawful to "discriminate against" an employee for retaliatory purposes. Section 704(a) states in pertinent part:

"It shall be an unlawful employment practice for an employer to *discriminate against* any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added).

In this case, we must ascertain the meaning of the term "discriminate" in § 704(a). Two possible interpretations are suggested by the language of §§ 703(a) and 704(a).

The first is the interpretation that immediately springs to mind if § 704(a) is read by itself-*i.e.*, that the term "discriminate" in § 704(a) means what the term literally means, to treat differently. Respondent staunchly defends this interpretation, which the majority does not embrace, but this interpretation presents problems that are at least sufficient to raise doubts about its correctness. Respondent's interpretation makes § 703(a) narrower in scope than § 704(a) and thus implies that the persons whom Title VII is principally designed to protect-victims of **\*2419** discrimination based on race, color, sex, national origin, or religion-receive less protection than victims of retaliation. In addition, respondent's interpretation "makes a federal case" out of any small difference in the way an employee who has engaged in protected conduct is treated. On respondent's view, a retaliation claim must go to the jury if the employee creates a genuine issue on such questions as whether the employee was given any more or less work than others, was subjected to any more or less supervision, or was treated in a somewhat less friendly manner because of his protected activity. There is reason to doubt that Congress meant to burden the federal courts with claims involving relatively trivial differences in treatment. See *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ; *Faragher v. Boca Raton,* 524 U.S. 775, 786-788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                Page 14

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

The other plausible interpretation, and the one I favor, reads §§ 703(a) and 704(a) together. Under this reading, "discriminat[ion]" under § 704(a) means the discriminatory acts reached by § 703(a)-chiefly, discrimination "with respect to ... compensation, terms, conditions, or privileges of employment." This is not, admittedly, the most straightforward reading of the bare language of § 704(a), but it is a reasonable reading that harmonizes §§ 703(a) and 704(a). It also provides an objective standard that permits insignificant claims to be weeded out at the summary judgment stage, while providing ample protection for employees who are subjected to real retaliation.

The Courts of Appeals that have interpreted § 704(a) in this way state that it requires a materially adverse employment action. See, *e.g., Von Gunten v. Maryland,* 243 F.3d 858, 865 (C.A.4 2001); *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (C.A.11 2000), cert. denied, 531 U.S. 1076, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001); *Robinson v. Pittsburgh,* 120 F.3d 1286, 1300 (C.A.3 1997). In *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761-762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), we "import[ed]" this test for use in a different context-to define the term "tangible employment action," a concept we used to limit an employer's liability for harassment carried out by its supervisors. We explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.,* at 761, 118 S.Ct. 2257.

II

The majority does not adopt either of the two interpretations noted above. In Part II-A of its opinion, the majority criticizes the interpretation that harmonizes §§ 703(a) and 704(a) as not sufficiently faithful to the language of § 704(a). Although we found the materially adverse employment action test worthy of "import[ation]" in *Ellerth,* the majority now argues that this test is too

narrow because it permits employers to take retaliatory measures outside the workplace. *Ante,* at 2412 (citing *Rochon v. Gonzales,* 438 F.3d 1211, 1213 (C.A.D.C.2006); *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984, 986 (C.A.10 1996)). But the majority's concern is misplaced.

First, an employer who wishes to retaliate against an employee for engaging in protected conduct is much more likely to do so on the job. There are far more opportunities for retaliation in that setting, and many forms of retaliation off the job constitute crimes and are therefore especially risky.

**\*2420** Second, the materially adverse employment action test is not limited to on-the-job retaliation, as *Rochon,* one of the cases cited by the majority, illustrates. There, a Federal Bureau of Investigation agent claimed that the Bureau had retaliated against him by failing to provide the off-duty security that would otherwise have been furnished. See 438 F.3d, at 1213-1214. But, for an FBI agent whose life may be threatened during off-duty hours, providing security easily qualifies as a term, condition, or privilege of employment. Certainly, if the FBI had a policy of denying protection to agents of a particular race, such discrimination would be actionable under § 703(a).

But in Part II-B, rather than adopting the more literal interpretation based on the language of § 704(a) alone, the majority instead puts that language aside and adopts a third interpretation-one that has no grounding in the statutory language. According to the majority, § 704(a) does not reach all retaliatory differences in treatment but only those retaliatory acts that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Ante,* at 2415 (internal quotation marks omitted).

I see no sound basis for this test. The language of § 704(a), which employs the unadorned term " discriminate," does not support this test. The unstated premise of the majority's reasoning seems to be that § 704(a)'s only purpose is to prevent employers from taking those actions that are likely to stop employees from complaining about

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                              Page 15

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

discrimination, but this unstated premise is unfounded. While surely *one of the purposes* of § 704(a) is to prevent employers from engaging in retaliatory measures that dissuade employees from engaging in protected conduct, there is no reason to suppose that this is § 704(a)'s only purpose. Indeed, the majority itself identifies another purpose of the antiretaliation provision: "to prevent harm to individuals" who assert their rights. *Ante*, at 2412. Under the majority's test, however, employer conduct that causes harm to an employee is permitted so long as the employer conduct is not so severe as to dissuade a reasonable employee from making or supporting a charge of discrimination.

### III

The practical consequences of the test that the majority adopts strongly suggest that this test is not what Congress intended.

First, the majority's test leads logically to perverse results. Under the majority's test, § 704(a) reaches retaliation that well might dissuade an employee from making or supporting "a charge of discrimination." *Ante*, at 2415 (internal quotation marks omitted). I take it that the phrase "*a charge of discrimination*" means the particular charge that the employee in question filed,[FN2] and if that is the proper interpretation, the nature of the discrimination that led to the filing of the charge must be taken into account in applying § 704(a). Specifically, the majority's interpretation logically implies that the degree of protection afforded to a victim of retaliation is *2421 inversely proportional to the severity of the original act of discrimination that prompted the retaliation. A reasonable employee who is subjected to the most severe discrimination will not easily be dissuaded from filing a charge by the threat of retaliation; the costs of filing the charge, including possible retaliation, will have to be great to outweigh the benefits, such as preventing the continuation of the discrimination in the future and obtaining damages and other relief for past discrimination. Because the possibility of relatively severe retaliation will not easily dissuade this employee, the employer will be able to engage

in relatively severe retaliation without incurring liability under § 704(a). On the other hand, an employee who is subjected to a much milder form of discrimination will be much more easily dissuaded. For this employee, the costs of complaining, including possible retaliation, will not have to be great to outweigh the lesser benefits that might be obtained by filing a charge. These topsy-turvy results make no sense.

> FN2. The alternative interpretation-that "a charge" does not mean the specific charge filed by the employee but an average or generic charge-would be unworkable. Without gauging the severity of the initial alleged discrimination, a jury cannot possibly compare the costs and benefits of filing a charge and, thus, cannot possibly decide whether the employer's alleged retaliatory conduct is severe enough to dissuade the filing of a charge. A jury will have no way of assessing the severity of the average alleged act of discrimination that leads to the filing of a charge and, therefore, if "a charge" means an average or generic charge, the majority's test will leave juries hopelessly at sea.

Second, the majority's conception of a reasonable worker is unclear. Although the majority first states that its test is whether a "reasonable worker" might well be dissuaded, *ante*, at 2415 (internal quotation marks omitted), it later suggests that at least some individual characteristics of the actual retaliation victim must be taken into account. The majority comments that "the significance of any given act of retaliation will often depend upon the particular circumstances," and provides the following illustration: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Ante*, at 2415.

This illustration suggests that the majority's test is not whether an act of retaliation well might dissuade the average reasonable worker, putting aside all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                    Page 16

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

individual characteristics, but, rather, whether the act well might dissuade a reasonable worker who shares at least some individual characteristics with the actual victim. The majority's illustration introduces three individual characteristics: age, gender, and family responsibilities. How many more individual characteristics a court or jury may or must consider is unclear.

Finally, the majority's interpretation contains a loose and unfamiliar causation standard. As noted, the majority's test asks whether an employer's retaliatory act "*well might have dissuaded* a reasonable worker from making or supporting a charge of discrimination." *Ante,* at 2415 (internal quotation marks omitted; emphasis added). Especially in an area of the law in which standards of causation are already complex, the introduction of this new and unclear standard is unwelcome.

For these reasons, I would not adopt the majority's test but would hold that § 704(a) reaches only those discriminatory practices covered by § 703(a).

IV

Applying this interpretation, I would affirm the decision of the Court of Appeals. The actions taken against respondent-her assignment to new and substantially less desirable duties and her suspension without pay-fall within the definition of an "adverse employment action."

With respect to respondent's reassignment, *Ellerth* specifically identified a "reassignment with significantly different responsibilities" as a " tangible employment action." 524 U.S., at 761, 118 S.Ct. 2257. Here, as the Court of Appeals stated, " [i]n essence, ... the reassignment was a demotion." 364 F.3d 789, 803 (C.A.6 2004). The "new position was by all accounts more arduous and ' dirtier,' " *ibid.,* and petitioner's**2422 sole stated rationale for the reassignment was that respondent's prior duties were better suited for someone with greater seniority. This was virtually an admission that respondent was demoted when those responsibilities were taken away from her.

I would hold that respondent's suspension without pay likewise satisfied the materially adverse employment action test. Accordingly, although I would hold that a plaintiff asserting a § 704(a) retaliation claim must show the same type of materially adverse employment action that is required for a § 703(a) discrimination claim, I would hold that petitioner met that standard in this case, and I, therefore, concur in the judgment.

U.S.,2006.
Burlington Northern and Santa Fe Ry. Co. v. White
126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op. Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385

Briefs and Other Related Documents (Back to top)

• 2006 WL 937535 (Appellate Brief) Reply Brief of Petitioner (Apr. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 690256 (Appellate Brief) Supplemental Brief for Respondent (Mar. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 615159 (Appellate Brief) Brief of the Lawyers' Committee for Civil Rights Under Law, The Asian American Justice Center, The National Association for the Advancement of Colored People, and the Puerto Rican Legal Defense and Education Fund, Inc. as Amici Curiae in Support of R espondent (Mar. 9, 2006) Original Image of this Document (PDF)
• 2006 WL 622123 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Respondent (Mar. 9, 2006) Original Image of this Document (PDF)
• 2006 WL 622124 (Appellate Brief) Brief of the American Federation of Labor and Congress of Industrial Organizations and the Brotherhood of Maintenance of Way Employees Division, International Brotherhood of Teamsters as Amicus Curiae in Support of Respondent (Mar. 9, 2006) Original Image of this Document (PDF)
• 2006 WL 622125 (Appellate Brief) Brief for National Employment Lawyers Association, AARP, Equal Justice Society and National Disability Rights Network as Amici Curiae in Support of Respondent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 2405                                                                                          Page 17

126 S.Ct. 2405, 74 USLW 4423, 06 Daily Journal D.A.R. 7866, 87 Empl. Prac. Dec. P 42,394, 06 Cal. Daily Op.
Serv. 5312, 19 Fla. L. Weekly Fed. S 326, 98 Fair Empl.Prac.Cas. (BNA) 385
**(Cite as: 126 S.Ct. 2405)**

(Mar. 9, 2006) Original Image of this Document
(PDF)
• 2006 WL 622126 (Appellate Brief) Brief for
Respondent (Mar. 9, 2006) Original Image of this
Document (PDF)
• 2006 WL 622508 (Appellate Brief) Briefs of the
National Women's Law Central et al., as Amici
Curiae in Support of Respondent American
Association of University Women American Civil
Liberties Union Association for Gender Equity
Leadership in Education Association of Trial
Lawyers of America Business and Professional
Women/USA California Women's Law Center
Connecticut Women's Education and Legal Fund
Dads and Daughters Equal Rights Advocates
Feminist Majority Legal Aid Society - Employment
Law Center Legal Momentum Myra Sadker Ad
(Mar. 9, 2006) Original Image of this Document
(PDF)
• 2006 WL 219564 (Appellate Brief) Brief of
Amicus Curiae the Association of American
Railroads in Support of Petitioner Burlington
Northern Santa Fe Railway Co. (Jan. 26, 2006)
Original Image of this Document (PDF)
• 2006 WL 235012 (Appellate Brief) Brief of the
Society for Human Resource Management and the
National Federation of Independent Business Legal
Foundation as Amici Curiae in Support of the
Petitioner (Jan. 26, 2006) Original Image of this
Document (PDF)
• 2006 WL 235013 (Appellate Brief) Brief Amici
Curiae of the Equal Employment Advisory Council
and the Chamber of Commerce of the United States
of America in Support of Petitioner (Jan. 26, 2006)
Original Image of this Document (PDF)
• 2006 WL 236069 (Appellate Brief) Brief of
Amicus Curiae International Municipal Lawyers
Association in Support of Petitioner (Jan. 26, 2006)
Original Image of this Document (PDF)
• 2006 WL 704480 (Appellate Brief) Brief of
Petitioner (Jan. 26, 2006) Original Image of this
Document (PDF)
• 2005 WL 3076063 (Appellate Petition, Motion
and Filing) Reply Brief of Petitioner (Nov. 14,
2005)
• 2005 WL 2974439 (Appellate Petition, Motion
and Filing) Brief in Opposition (Oct. 31, 2005)
• 2005 WL 2376679 (Appellate Petition, Motion

and Filing) Brief Amicus Curiae of the Equal
Employment Advisory Council in Support of
Petitioner (Sep. 23, 2005)
• 2005 WL 2341980 (Appellate Petition, Motion
and Filing) Brief of Amicus Curiae the Association
of American Railroads in Support of Petitioner
(Sep. 22, 2005)
• 05-259 (Docket) (Aug. 26, 2005)
• 2005 WL 2055901 (Appellate Petition, Motion
and Filing) Petition for a Writ of Certiorari (Aug.
24, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 21

Rajendra D. Badgaiyan, M.D.

84

1   actually, she was making comments about Indians in

2   particular, Indian doctors in particular, and at

3   that time I told her, the harshest words that I

4   used, that having been to India, having seen how

5   doctors work in India, Dr. Mushrush, don't use these

6   comments.  These were the harshest words I ever

7   used.

8        Q.  And did she ever use any harsh words to you?

9        A.  Oh, yeah, all the time.

10       Q.  Okay.  And all the time, so every

11  communication with her you had she used angry or

12  harsh words with you?

13       A.  Not every -- all the time, I do not mean all

14  the time meaning 100 percent, all the time means --

15       Q.  Well, I am just using your answer, you said

16  all the time.

17       A.  I'm sorry, I take back all the time -- many

18  times.

19       Q.  Were they angry words?

20       A.  Yes.

21       Q.  So it's your testimony that the tenor of

22  your relationship with Dr. Mushrush was an angry one

23  from her side?

24       A.  Most of the time.

99

1    A.  Yes, I did not.

2    Q.  And he didn't give you a year on this?

3    A.  I don't remember.

4    Q.  Anybody else besides these people you have

5    identified?

6    A.  No.

7    Q.  Let's talk about Dr. Mushrush, you say that

8    she made some remarks that were derogatory in nature

9    about people of Indian national origin, correct?

10   A.  Yes.

11   Q.  And you told me specifically that she said

12   that Indian doctors -- hold on just a second -- that

13   Indian doctors were not as good, or words to that

14   effect, as American doctors because of the medical

15   education there?

16   A.  I did not say that, I don't recall saying

17   that.

18   Q.  Tell me what Dr. Mushrush said to you in

19   this regard?

20   A.  She made comments many times, maybe five or

21   ten times, that Indian doctors don't value life, and

22   they don't care about the patients, they are not

23   dedicated to patient care.

24   Q.  Okay.  Anything else?

Rajendra D. Badgaiyan, M.D.

100

1    A.  She made comments to that effect many times.

2    Q.  Okay.  Now, you said many times, and then

3  you said earlier five to ten times?

4    A.  Yes.

5    Q.  Now, ten is twice the number of five, you

6  would agree with me on that?

7    A.  Yeah, but I did not count it, yeah.

8    Q.  So you are telling me it's somewhere between

9  five and ten times?

10    A.  Yes.

11    Q.  And that's over the period of what

12  timeframe?

13    A.  Two years, I guess.

14    Q.  And the two years would be what years?

15    A.  Maybe between 2000 and 2003, so three years

16  probably -- 2002, actually.

17    Q.  It stopped in 2002?

18    A.  I'm sorry, no, I did not go to the V.A. in

19  2003 because I was doing research, but I was in the

20  V.A. until December of 2002, so but these comments

21  were made between January of 2000 and December of

22  2003.

23    Q.  Okay.  You started there in October of '99?

24    A.  Right.

Rajendra D. Badgaiyan, M.D.

109

1    tell me about right now?

2        A.   I don't know.

3        Q.   Are there any documents you have in your

4    mind that you think if I look at those, then I can

5    answer your question in more detail?

6        A.   I cannot think about it right now.

7        Q.   Are there any people you can talk to that

8    you have in your mind right now that would serve to

9    refresh your memory?

10       A.   I don't know, if I start thinking about it,

11   then I would know how I can best recall the

12   circumstances.

13       Q.   Okay.  So as far as we can do today, you

14   have told me everything that you can recall

15   regarding statements by Dr. Grace Mushrush that were

16   derogatory toward people of Indian national origin,

17   correct?

18       A.   Yes.

19       Q.   Do you allege that she called you a bad boy

20   at a conference?

21       A.   Yes.

22       Q.   And do you consider that derogatory towards

23   your national origin?

24       A.   Yes.

Rajendra D. Badgaiyan, M.D.

110

1    Q.   How so?

2    A.   Because she called me bad boy, she used to

3    call me bad boy, not once, I think there is two

4    occasions that I know of, in front of everybody,

5    including my juniors whom I was supposed to

6    supervise.

7    Q.   And how do you connect that to your national

8    origin?

9    A.   I don't know, I don't know how I can connect

10   it, but it shows her mindset, I guess.

11   Q.   And what was the context in which she used

12   the phrase?

13   A.   There is no context, she said, Where is the

14   bad boy, I am talking about Dr. Badgaiyan.

15   Q.   Well, there must have been a subject that

16   came up regarding you?

17   A.   No, one incident that I know I was not

18   there, I was with a patient, and there was a

19   conference, everybody was there, and she said, Where

20   is that bad boy?  And somebody asked her, Who are

21   you talking about?  She said, I am talking about

22   Dr. Badgaiyan.  And I was told by the residents that

23   is what she said?

24   Q.   And was she referring to the fact that you

Rajendra D. Badgaiyan, M.D.

240

1    Q.  As a way to support a Limited License

2  Application so you could begin training as soon as

3  possible?

4    A.  Yes.

5    Q.  And that's training in the Nuclear Medicine

6  Training Program?

7    A.  Yes.

8    Q.  And that's the limited license that you

9  testified earlier today was not granted?

10    A.  Yes.

11    Q.  Now, the delay in August is in part

12  occasioned by vacations, is that right?

13    A.  No, he sent me an interim report before

14  leaving on vacation.

15    Q.  I see.  But in terms of the Full License

16  Application, the vacation schedule in August is

17  delaying the further completion of that, correct?

18    A.  Correct.

19    Q.  Now, the delay that you assigned to

20  Dr. Mushrush in getting information into the Board

21  of Registration, what was the period of delay that

22  you believe was caused by her?

23    A.  Yeah, when I submitted my application for

24  limited license, she took more than a month, I think

# EXHIBIT 22

**Robert William McCarley, M.D.**
**March 2, 2006**

87

```
 1        A.   Dr. Badgaiyan's promotion or nonpromotion.

 2        Q.   And how did that come up?

 3        A.   It came up because the promotions committee

 4   was concerned that there had been what they deemed

 5   to be serious problems with him, so that they didn't

 6   deem him worthy of promotion.

 7        Q.   Do you recall what the problems were?

 8        A.   Again, I don't know the details; but the

 9   bottom line was that his clinical performance

10   wasn't good, and his attitude wasn't good.

11        Q.   How did you learn about that?

12        A.   Through Dr. Swett, whom I talked with about

13   this.

14             Dr. Swett had also discussed this with

15   Dr. Mushrush, and people who were Dr. Badgaiyan's

16   supervisors.

17        Q.   Can you remember any of their names?

18        A.   Dr. Badgaiyan's supervisors?  I don't

19   recall them exactly.

20        Q.   Did you ever discuss Dr. Badgaiyan with

21   Dr. Mushrush?

22        A.   My main contact was through Dr. Swett, who

23   was chief of clinical operations in mental health;

24   and he also was a member of the promotions and
```

# EXHIBIT 23

Name: Rajendra D. Badgaiyan          Grade: _____
Title: Resident ●                    Service: ● Psychiatry

**Indicate the basis of your complaint (check those that apply specifically to your complaint).**

☐ Race (Specify _____)          ☐ Religion (Specify _____)
☐ Color (Specify _____)         ☒ National Origin (Specify India)
☐ Age (Specify date of birth _____)     ☐ Handicap (Specify _____)
                                            _____ /provided documentation)
☐ Gender (Specify _____)        ☐ Reprisal for prior EEO activity (Specify the
                                            activity _____)

**Describe in detail the specific incident(s) that took place within the past 45 calendar days that caused you to feel you had been discriminated against.  List people, dated, and events.**

I received a letter signed by Dr. Grace J. Mushrush, Director of Residency Training, denying me timely promotion.

**If this(es) incident(s) is beyond the 45 calendar days, please specify reason(s) why you waited before contacting an EEO Official?**

The mental stress caused by the discrimination made me cognitively disoriented. My blood pressure increased to a life-threatening level and I had major depression. I was bedridden until last weekend was unable to think about the remedial action.

**Who is the responsible management official (RMO)?**

Grace J. Mushrush, Director, Residency Psychiatry (508) 583-4501
Name              Title         Training  Service      Phone Number ext 2457 2486

**What is this individual's relationship to you?**   Supervisor.
   (For example – supervisor, team leader, service chief, etc)

**How have you been treated differently that a like-situated employee?  Be specific.**

Other residents who have similar or worse performance evaluations were promoted to the next year while I was denied promotion and renewal of contract.

**How has this treatment caused you harm in your employment?  (For example, has there been a loss of wages, grade, etc?)  Be specific:**

- Loss of grade and time of training
- Adverse entry in my service record.
- Defamation and mental stress.

**If you have documentation to support your claim of discrimination, please indicate what this is and provide counselor with copies.**

letter enclosed.

**What Remedy are you seeking to resolve your complaint informally?**

- Withdrawal of the enclosed letter and renewal of contract.
- Removal of adverse entry in my service record.
- Compensation for mental stress and service related loss.

[signature]                          9/4/02
Signature of aggrieved               Date

02 SEP 11 AM 9:51
OFFICE OF RESOLUTION
MANAGEMENT
BEDFORD SATELLITE

**EXHIBIT**
Badgaiyan
5|17|06   PH

**Rajendra D. Badgaiyan, MD**
122-A, Sycamore St
Somerville, MA 02145

September 4, 2002

Dear Ms Velez,

I am a trainee in psychiatry residency training program at VAMC Brockton. This is actually a complaint of mixed case in which denial of my promotion to PGY-IV is based on biased opinion and disregard to the merit. Since I received attached letter on May 30, 2002, it was revised unofficially several times but was never withdrawn. I have never been informed about the complaints mentioned in the letter and was never given an opportunity to explain my position. The decision to deny promotion is extremely rare in the residency program (as far as I know, in the last 10 years only one other resident was denied promotion). Many residents who had much worse documented evaluations of their performance have been promoted. The decision has put a permanent adverse entry in my service record, and has *defacto* declared me one of the worst residents, the residency program ever had. This is clearly not true and is not apparent from the evaluations of about 30 of my supervisors and preceptors. Most of my evaluations, that I know of, are 'above average' and many are 'outstanding'. Further, in a nationally conducted clinical evaluation test, this year my performance was judged to be the best in my class, and I have been honored during the training period for my research at the international, national, and local (Harvard Medical School) levels.

Even though the decision was made by a committee, many members of the committee have told me that they personally do not think that I am a bad resident – not to talk of one of the worst residents the program ever had. I believe that the members were misled by the Director who is the Chairman of the committee. The Director has expressed her disliking and biased opinion against the doctors of Indian origin on several occasions, because she thinks that, "they are smart and confident".

This discrimination has caused considerable physical and mental stress, resulting in increase of my blood pressure to a life threatening level. I have also been diagnosed to have major depression after the above incidence. I am currently taking medications for both of these conditions.

Sincerely,

Rajendra Badgaiyan

02 SEP 11  AM 9:50
OFFICE OF RESOLUTION
MANAGEMENT
BEDFORD SATELLITE

VA262