## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RAJENDRA D. BADGAIYAN, M.D.,**<br><br> **Plaintiff,**<br><br>v.<br><br>**ANTHONY J. PRINCIPI, Secretary, Department of Veterans' Affairs; President and Fellows of HARVARD COLLEGE; and Grace J. Mushrush, M.D.,**<br><br> **Defendants.** | **Case No. 04-12031 JLT** |

## DEFENDANT HARVARD'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, PURSUANT TO LOCAL RULE 56.1

Defendant Harvard University hereby submits in support of its Motion for Summary Judgment the following material facts of record,[1] as to which no genuine dispute exists for trial, pursuant to L.R.D.Mass. 56.1:

The Parties and the Brockton VA

1. The United States Department Veterans Affairs ("the VA") is a cabinet–level agency of the United States Government which owns and operates a national health care system, including the V.A. Boston Health Care System, Brockton Campus, in Brockton, Massachusetts. The VA operates the Harvard South Shore Psychiatry Residency Training Program at its Brockton Campus. (McCarley dep. 25, 35-37 and ex. 2; Mushrush dep. 73).

---

[1] References to the deposition of the Plaintiff, Rajendra D. Badgaiyan will appear as "(Pl. dep. )," or, where an exhibit is referenced, as "(Pl. dep. ex.)." References to the deposition of Robert McCarley will appear as "(McCarley dep. )." References to the deposition of Grace Mushrush on 2/23/06 will appear as "(Mushrush dep. )" and as to the deposition of Grace Mushrush on 6/19/06, which was improperly labeled as Volume I, as "(Mushrush dep. II )." References to the deposition of Aafaque Akhter will appear as "(Akhter dep. )." All deposition exhibits will be referred to as "ex."

2.  The President and Fellows of Harvard College, also known as Harvard University, is a charitable corporation established under the laws and Constitution of the Commonwealth of Massachusetts, and is a private, degree granting institution located in Cambridge, Massachusetts. (Defendant's Answer to Amended Complaint ¶ 5)

3.  Harvard University has a medical school known as the Harvard Medical School, which is located in Boston, Massachusetts.

4.  The Commonwealth of Massachusetts Board of Registration of Medicine (the "BRM" or the "Board") is an agency of the Commonwealth of Massachusetts whose mission is "to serve the public by striving to ensure that only qualified physicians are licensed to practice in the Commonwealth, to ensure that those physicians and health care institutions in which they practice provide to their patients a high standard of care, and to support an environment that maximizes the high quality of health care in Massachusetts.  The Board investigates complaints, holds hearings and determines sanctions. These functions are critical to protecting the public by ensuring that only competent physicians and acupuncturists are practicing in Massachusetts." *Web Site of Commonwealth of Massachusetts, Board of Registration in Medicine, "Mission Statement."*  http://www.massmedboard.org/

5.  The Harvard Medical School and the United States Department of Veteran Affairs entered an agreement entitled "Memorandum of Affiliation, School of Medicine Agreement Between Department of Veterans Affairs and the Undersigned School of Medicine," (the  "Affiliation Agreement") dated September 1997. (McCarley dep. ex 2).  The Affiliation Agreement is a standard VA form agreement that the VA uses around the country. (Dale aff. ¶7). There is a similar agreement between the VA and Boston University Medical School. (Mushrush dep. 33).  At some point, Tufts Medical School also was affiliated with the VA in some way.  (Mushrush dep. 36).

The affiliation is loose, and Harvard does not have day-to-day control. (Mushrush dep. 31; McCarley dep. 35-37, 50 and ex 2).

6.   The Affiliation Agreement states that "Nothing in this agreement grants to the education institution [Harvard] or the Partnership Council any legal authority to exercise control over any VA program or facility.  Ultimate responsibility for the control and operation of the VA facilities and programs rests with VA."  (McCarley dep. 35-37,  and ex 2; Mushrush dep. II 17).

7.    Medical school graduates seeking to specialize in psychiatry must complete four years of post-graduate training in residence at one or more medical facilities or hospitals, which training is known as a residency.   (McCarley dep. ex 1; Mushrush dep. 68-69).

8.   The VA operates the Harvard South Shore Psychiatry Residency Training Program (the "Program") at its Brockton, MA campus.  When a resident is accepted by the VA at the Program, the academic head of the Harvard Department of Psychiatry at the VA submits a form to Harvard and the resident automatically receives an unpaid academic title from Harvard Medical School.   (McCarley dep. 31-32, 33-35).

9.   Physicians employed by the VA who oversee resident trainees at the Harvard South Shore Psychiatry Residency Training Program routinely hold faculty appointments from Harvard Medical School, and in some cases from Boston University Medical School. (McCarley dep. 42, 51; Mushrush dep. 30, 72-73, 80-81).

10. The VA has a large number of rules and regulations governing all of its medical programs and employees, including the Program and its staff.  *See* (McCarley dep. 64). Among these are strict rules regarding, unlicensed medical professional employees, human resources procedures, record keeping, hiring preferences and other functions.   (Mushrush dep. 85-86, 138, 201).  Residents in the Program usually are

paid through the VA central office, except for 2 residents who were paid through the Commonwealth of Massachusetts. (Mushrush dep. 203-204).

11. The Program's residency training includes numerous mandatory training rotations, both at the Brockton Campus and other facilities. (McCarley dep. 51; Mushrush dep. 55, 68-69, 81, 101; Pl dep. ex. 15). This residency includes at least 36 months of clinical training.

12. The Accreditation Council for Graduate Medical Education ("ACGME") has strict standards requiring psychiatric resident trainees in accredited programs, including the Program, to attain a minimum of 36 months in clinical experience in inpatient, outpatient, child and adolescent and other areas of psychiatry. (McCarley dep. ex 1 pp.10-12). The VA is responsible for assuring that the Program is accredited. (see McCarley dep. 82, 35-37, 53-55).

13. Over time, the VA consolidated and merged certain operations and functions in the Brockton, Jamaica Plain and West Roxbury facilities, creating the "VA Boston HealthCare System." (Mushrush dep. 36, 81, McCarley dep. 26, 51). As a result of the change, there was more integration of Harvard and BU faculty and residents. (Mushrush dep. 36; McCarley dep. 51). More recently, a new chief, Dr. Kaplan, who formerly worked for the VA in Providence, RI, decided to open the application process for the position of Director of the Program. (McCarley dep. 26, 28, 42).

14. Between one eighth and one quarter of residents in the Program are of South Asian origin. (Mushrush dep. II 61).

Plaintiff's Acceptance into the Program in 1999.

15. Foreign medical graduates and physicians who enter the United States to practice medicine are required to have additional training in order to receive their medical

license, and must take a special test called the "USMLE." (Mushrush dep. 167; Pl. dep. ex 11 BRM0056, 0064, 0066, 0068, 0071).

16. Prior to entering the United States, the Plaintiff received his medical training in India, and practiced medicine in India for nearly 15 years. (Pl. dep. ex 11, BRM 0059-63, 0065-66). The Plaintiff failed portions of the USMLE exam required to practice medicine and /or for admission to residency training (Pl. dep. 198) and disclosed the records of this to the BRM. (Pl. dep. ex 11 BRM0071, 0064, 0066-0067).

17. Dr. Mushrush accepted the Plaintiff, on the recommendation of her superior, Dr. Robert McCarley. (Mushrush dep. 137-38).

18. During the course of his psychiatric residency in the Program, the Plaintiff also worked at Harvard or Harvard-affiliated entities in positions unrelated to his psychiatric training. (Pl. dep. 11-12, 18, 317 and ex. 15 BRM0148).

19. The Plaintiff entered the Program in October 1999 and graduated in December 2003. Sometime after graduating from the Program, the Plaintiff entered a residency training program in Nuclear Medicine at another Harvard Medical School affiliated program. (Pl. dep. ex 12 BRM0109).

20. The employment and "training" records related to the Plaintiff's training at the Program were at all times kept at the Brockton VA facility. (Mushrush dep. 8-9, 86).

Mushrush's Supervision of Plaintiff

21. During the relevant period, Dr. Mushrush was the Program Director of the Harvard South Shore Psychiatry Residency Training Program, and was at all times employed by the VA, which paid all of her salary. (Mushrush dep. 201).

22. Dr. Mushrush held a faculty appointment at Harvard Medical School which was unpaid. (Mushrush dep. 40). She did not work at the Harvard Medical School, had no office at the medical school, and she did not view herself as its employee; her title

5

as Director of the Harvard VA South Shore Psychiatry Programmed was conferred by the VA. (Mushrush dep. 201-202; *See* McCarley dep. 47-48).  Dr. Mushrush did not have authority to make academic appointments at Harvard.  (Dale aff. ¶10).

The Plaintiff's Residency Problems

23. In the Plaintiff's first or second year, he did not show up for a rotation known as "evening clinic" led by Dr. Mushrush.  Dr. Mushrush asked the Plaintiff to attend. (Mushrush dep. 141-42; *see* Pl. dep. ex 15).  Patients also complained to Dr. Mushrush and others that the Plaintiff did not listen to them.  (Pl. dep. ex 15 BRM0141-142).

24. After his first few months in the Program, Dr. Mushrush did not authorize the Plaintiff's absence from the Program to work as a researcher at another Harvard-affiliated institution. (Mushrush 13-14; Pl. dep. ex 15 BRM0148, 130, 126).

25. Residents in the Program complained to Dr. Fe Festin about the Plaintiff not being required to attend rotations.  (Mushrush dep.145).  Festin gave the Plaintiff a marginal to average evaluation in a rotation.  (Pl. dep. ex. 15 BRM 0142).

26. Dr. Mushrush believed that there was a pattern of problems that indicated that the Plaintiff had particular difficulty with female supervisors and told the Plaintiff of this. (Mushrush dep. II 46-47).

27. The Program's Promotions Committee wrote to the Plaintiff in April 2002 and noted that Dr. Badgaiyan seemed to "have an inability to work collaboratively with women: attendings, senior residents and nursing staff."  (Pl. dep. ex 4; and ex. 15).

28. Dr. Julian Sieffer, an attending physician in medicine at the West Roxbury VA, rated the Plaintiff average or below average in all but one area.  He wrote "follows suggestions but not completely independent."  (Pl. dep. 270 & ex. 15 BRM 0117).

29. The Plaintiff's supervisor at the McLean Hospital, Dr. Sarah Bolton, gave him poor
    evaluations noting that he "did not want to have to do a rotation with us at all, and
    took several days off that were not excused. While doing some complete work ups,
    there were times when I reviewed his work after supervision and noted that he had
    not made the recommended changes to his work up prior to leaving for the day.  He
    had significant problems interacting with nursing staff and triage staff in ways that
    interfered with good patient care."  (Pl. dep. 271-72 & ex 5, 15 BRM0125-126;
    Mushrush dep. p 123-24).  Later, Dr. Mushrush contacted Dr. Bolton to ask if the
    Plaintiff could repeat the McLean rotation.  Drs. Bolton and Dr. Barreira sent Dr.
    Mushrush a letter refusing her request to allow the Plaintiff to return for a rotation at
    the McLean Hospital.  (Pl. dep. ex. 15 BRM0126).

30. Dr. Mushrush wrote the Plaintiff an email message on June 25, 2002, informing him
    that he needed to complete his remedial rotations.  In this message she wrote that " . .
    McLean has refused to have you back because the CEC [Clinical Evaluation Center]
    found the experience so unpleasant. . ." (Pl. dep. ex. 7 VA274).  Dr. Bolton surveyed
    Dr. Asha Parikh, Dr. Paul Barreira, Victor Petrella and Diane Bedell, at McLean
    Hospital who shared her views.  (Pl. dep. ex. 15 BRM0126).

31. Dr. Sonia Kiota sent Dr. Mushrush an email complaint that the Plaintiff was not
    where he was supposed to be for a rotation.  (Mushrush dep. 147).

32. Dr. Naqui, who was a Chief Fellow and a resident at the West Roxbury VA clinic,
    complained that the Plaintiff had not showed up for "call." (Mushrush dep. 147).

33. Dr. David Osser had difficulty with the Plaintiff on a REACH rotation, and wrote a
    poor evaluation of the Plaintiff. (Mushrush dep. 158).  Dr. Osser wrote that the
    Plaintiff "didn't cooperate at all for the first two weeks, he didn't work up assigned
    patients (didn't inform patient or staff that he didn't follow through) until we had

extended discussions about his lack of respect for my "approach" . . . during my 3 weeks of leave in August, he was supposed to attend team meetings and make himself available during his usual REACH hours and staff reported to me that he was not there. . .No matter how you look at it, his disrespect for a (female) colleague here is again very problematic." (Pl. dep. ex 15, BRM0132-34). At one point Osser wrote that he had received reports of the Plaintiff's "problem behaviors and careless, rushed work and I felt that he should not get a passing grade." (Pl. dep. ex 15, BRM0132-34).

34. Osser also noted concerns about the Plaintiff's assessment of medical issues in which he overlooked at patient history and "concerns about his not knowing what was in the patient's records." (Pl. dep. ex 15, BRM0132-34). Osser said that the Plaintiff failed to submit workload documents promptly. The Plaintiff later noted that "I have difference of opinion with Dr. Osser and I think his approach does not pass scientific scrutiny." (Mushrush dep. II ex 1 BRM0149).

35. Dr. Osser ultimately gave the Plaintiff a highly critical evaluation in which he wrote "Overall I rate a 3, barely satisfactory." (Pl. dep. 273-76; and ex. 15 BRM0131).

36. Dr. Michael Mufson complained to Dr. Mushrush about the Plaintiff's performance in a rotation at the West Roxbury but passed him. He wrote that "Dr. Badgaiyan had difficulty working with the team." (Mushrush dep. 146, 196-97).

37. Dr. Tishler of the West Roxbury VA medical service was upset with the Plaintiff and removed him from the medical service there. (Mushrush dep. 157).

38. Dr. Ronald Gurrera was in charge of clinical programs for the Program and normally was responsible for receiving and handling less serious complaints about residents' performance. (Mushrush dep. 88-89). Dr. Gurrera received and forwarded complaints from others about the Plaintiff to Dr. Mushrush. (Mushrush dep. 163).

39. Dr. Gurrera identified an incident in which the Plaintiff did not cooperate with a physician on duty in violation of Gurrera's directions, and Dr. Gurrera indicated that the Plaintiff misled him about his response. Gurrera wrote that the "incident does not appear to represent an isolated lapse of judgment. . ." (Pl. dep. ex 6 and ex. 15 BRM 0151).

40. In another incident, Dr. Gurrera stated that Dr. Badgaiyan failed to respond in a "timely manner to the need for emergent medication and refused to consider nurses advice." (Pl. dep. ex 6). As a result, of the Plaintiff's management of the patient, he broke through his restraints and escaped from the facility and Dr. Gurrera found the Plaintiff's response inappropriate: "In general, his actions on that day, and his demeanor today, failed to demonstrate the level of concern that this very dangerous, potentially disastrous, situation demanded." (Pl. dep. ex 6 and ex. 15 BRM0145, 0151-153). Nurse Laurie Cranford wrote a formal letter of complaint as a result of the Plaintiff's conduct. She noted that "The nursing staff on the unit raised the issue that they felt this patient had been mismanaged and subsequently felt it to be abusive. Staff also felt that not only was the patient's safety compromised, but that the safety of the staff and other patients were also jeopardized by lack of [Plaintiff's] proper medical support, in their opinion." (Pl. dep. ex 15 BRM0146). The Plaintiff later sent a memo to Dr. Mushrush indicating that the nursing staff was at fault: "This breech of security was clearly a result of the failure of nursing staff to recognize agitation and informing the POD [Plaintiff] promptly." (Pl. dep. ex 15 BRM0147).

41. The Plaintiff complained in written correspondence to Dr. Robert McCarley, that he was being forced to repeat several of the rotations that he had passed, and attached a list of the rotations. (McCarley dep. ex 8). Dr. Mushrush had either received complaints from the Plaintiff's supervisors or received poor evaluations in several of

these rotations, including at the McLean Hospital, a rotation at Taunton State Hospital, and rotations supervised by Drs. Bolton, Barreira, Festin, Osser, and others. (Pl. dep. ex 15; Mushrush dep. II 14-15).  Dr. Swett oversaw and participated in deciding which rotations the Plaintiff would repeat.   (McCarley dep. ex 12).

42. At the end of his second year, the Plaintiff complained about having to attend the rotations required of all residents and stated that "If an attending is not willing to adjust (sic) supervision schedule to let me continue my work [in unrelated off-site research] I should be the one to complain." (Mushrush dep. II ex 1 BRM0149).

43. The Plaintiff took an oral examination at the end of his second year, in the spring of 2001, which he did not pass, and he was told that he had failed.  (Pl. dep. 40 and ex. 15 BRM0148). The test was not properly administered, and the Plaintiff was offered the opportunity to immediately re-take the test, which he did not do.  The Plaintiff did not re-take the test until May 3, 2002.  (Pl. dep. ex.15 BRM 0154-155, 0158).

44. Dr. Mushrush notified the Plaintiff in an email message dated July 6, 2001 that: "you failed your McLean Rotation and your oral exam.  Your behavior does not endear you to any of the faculty.  How do expect people to respond favorably to you when you announce upon arrival at each rotation that you don't care about clinical psychiatry and that you don't want to be on the rotation in the first place. . .  I have discussed your performance or lack thereof with the residency training committee and you are hereby  placed on probation . ."   (Pl. dep. II ex 1 BRM0148).

45. The Plaintiff later failed to disclose the fact that he had been on probation to the BRM and later explained that "I did however receive an informal e-mail (during the PGY-2 year) in which among other things, the director casually mention the probation." (sic) (Pl. dep. ex 11 0056-57, 0068).

46. Dr. Chester Swett "had an opinion and in the opinion of the evaluations and promotions committees, the problems were sufficiently strong that they recommended against promoting him. They thought he was not performing adequately in terms of clinical psychiatry." (McCarley dep. 95, 87-89, 91; Pl. dep. ex.9 VA 276).

47. The DuPont Fellowship was awarded by Harvard Medical School; Dr. McCarley recommended that the Plaintiff received the fellowship and it was awarded to him in 2003. (McCarley dep. 91).

48. The Program has a Committee on Promotions, which determines whether residents will be promoted at the end of each year of training. Each training year is designated "PGY" for post-graduate year. (McCarley dep. 58; Pl. dep. ex. 15 BRM0152-0153).

49. In addition to Dr. Mushrush, the Program's Promotions Committee consisted of Drs. Festin, Swett, Gurrera, Levitt and Osser. (Pl. dep. ex.15 BRM0152).

50. On April 26, 2002 the Promotions Committee met and found that the Plaintiff had substantial performance problems, suggested that he receive psychotherapy and unanimously recommended that he have three months of remedial training. The Promotions Committee took minutes of the meeting. (Pl. dep. ex. 9 and ex. 15 BRM0152). Dr. Swett later wrote that "the promotions committee of the residency program met recently to review all of the residents. All were promoted except for one. There was some sentiment that he should be dismissed from the program. Finally, the committee unanimously recommended that he have three additional months of remedial work before being promoted to the PGY 4 year." (Pl. dep. ex 9). The Plaintiff has no reason to believe that the information contained in the minutes of this meeting is not true. (Pl. dep. 288 & ex 15 BRM0152-153).

51. Dr. Mushrush did not tell other supervisors what to say about the Plaintiff's performance. (Pl. dep. 288 ex 15 BRM0126; Mushrush dep. 183).

52. Supervisors other than Dr. Mushrush had the opinion that the Plaintiff needed remedial training. (McCarley dep. 87-89, 91-92; Pl. dep. ex 15, ex 9 VA276). "[H]e was having problems in his clinical-residency performance and attitude . . . he was not passing." (McCarley Dep. p. 88, 91).

53. The Plaintiff admitted that he had difficulty with some of his supervisors in the Program. (Pl. dep. 161).

54. The Plaintiff has no reason to believe that Drs. McCarley, Gurrera, Osser, Tishler, Chang, Swett, Barreira, Bolton and others who evaluated him harbored discriminatory animus. (Pl. dep. 85-86, 90-92, 271-72).

55. The only independent witness that the Plaintiff produced in discovery was Dr. Aafaque Akhter, with whom the Plaintiff previously discussed his grievances, and who alleged that Dr. Mushrush made a racially biased statement indicating that some American doctors don't like Indian doctors because they are confident and smart, and annoying. (Akhter dep. 11-12, 27-28). Although he filed a formal charge of discrimination against another doctor, Dr. Akhter never complained about or filed a charge against Dr. Mushrush. (Akhter dep. 40).

56. Dr. Badgaiyan was depressed during the summer of 2002, and Dr. Mushrush sent him to Dr. Salzman who recommended anti-depressant medication. (Mushrush dep. 165)

57. The Plaintiff was absent from the Program for about a month because of depression and high blood pressure. He returned to the Program on a part-time basis. (Mushrush dep. 193).

58. During the summer of 2002, the same time period in which he reported being ill, one of the Plaintiff's fellow residents, Reluca Savuu became romantically interested in him. Dr. Savuu appeared at the Plaintiff's home and workplace, creating a situation serious enough to prompt Dr. Fe Festin to report these as incidents of "stalking" to

Dr. Mushrush and causing Dr. Mushrush to offer to assist the Plaintiff in seeking a restraining order. The Plaintiff declined the offer. (Pl. dep. 47-51; Mushrush dep. 164-65).

59. During his residency, the Plaintiff took a couple of weeks off to go to England. (Mushrush dep. 184).

60. The Plaintiff took sick leave in advance during July 2001. (Mushrush dep. II ex 1 BRM0149; Pl. dep. ex 15 BRM0125-26).

61. The Plaintiff graduated from the Program after 4 years and 3 months. (Pl. dep. 308-309 & ex 12; McCarley dep. ex 5).

62. The VA has local legal counsel called District Counsel. (Mushrush dep. 168, 204).

63. When she received a form and application for the Plaintiff's full medical license from the BRM, Dr. Mushrush forwarded it to VA District Counsel for review because the Plaintiff had pending EEOC grievances. Anything she had to send out thereafter regarding Dr. Badgaiyan went through VA District Counsel. (Mushrush dep. 168, 177, 204).

VA Internal EEO Grievance.

64.  District Counsel represented the VA in the Plaintiff's internal EEO grievance and his subsequent appeals to the EEOC. (Mushrush dep. 168 & ex. 3).

65. The Complainant filed an internal, written charge of discrimination with a counselor in the VA Office of Resolution Management ("ORM"). In his internal charge of discrimination the Plaintiff wrote that Dr. Mushrush "expressed her disliking and biased opinion against doctors of Indian origin on several occasions, because she thinks that, 'they are smart and confident.'"  (Pl. dep. ex 1 VA262).

66. The Plaintiff did not allege in any filing to the EEO that Dr. Mushrush said that Indian doctors "don't value life, that they kill their patients" or that she asked the

Plaintiff if he had killed anyone today. (Pl. dep. 128-135) *compare* (Pl. dep. 99-100). Plaintiff claims he neglected to include these statements in his EEO charge because he had to "limit the length of the letter" and blames the EEO investigator of "probably" failing to include all of his statements in her report. (Pl. dep. 129, 135). The Plaintiff filed several appeals, and supplementary statements to the EEO. (VA002-005); *Badgaiyan v. Principi,* 2004 WL 1494335 (E.E.O.C., EEOC DOC 1A40345 (Off. of Fed. Operations, 2004)).

67. The Plaintiff did not file a worker's compensation claim against Harvard. (Pl. dep. 315).

Dr. Mushrush's Alleged Statements

68. After Dr. Mushrush refused to authorize him to leave a rotation to attend a research meeting at Harvard, the Plaintiff alleges that Dr. Mushrush told him that if he continued leaving his rotation, she would "spoil" his career. (Pl. dep 115-116). The Plaintiff testified that "I was never absent without Dr. Mushrush's permission . . ." (Pl. dep. 272). There are several written statements indicating Dr. Mushrush and other preceptors did not give the Complainant permission to be absent. (Pl. dep. ex. 15 BRM0125, 0126, 0132, 0148-149 and dep. 109-110).

69. In his only complaint to a Harvard representative, the Plaintiff wrote an email to the Harvard Medical School head of the academic department, Dr. Robert McCarley, that Dr. Mushrush has "open contempt for research in general, and researchers in particular" in June 2002, after the Plaintiff learned that he was being asked to do remedial work. (McCarley dep. ex 6). He also told Dr. Mushrush that he felt he was being "unfairly targeted because of my academic activities." (Mushrush dep. II ex 1 BRM0148).

70. In none of his complaints to Dr. McCarley did the Plaintiff mention racial discrimination.  (Pl. dep. 307).  As a result of the Plaintiff's complaint, Dr. McCarley consulted with Drs. Swett and Mushrush to assess the Plaintiff's claims.  (McCarley dep. ex 6, 7, 8, 12).  Dr. Swett spoke to other supervisors about the Plaintiff's performance. ( McCarley dep. 87-89).

71. In his email to Dr. McCarley, the Plaintiff accused Dr. Mushrush of forcing him to repeat rotations even though the Plaintiff had been notified previously that it was the Promotions Committee that had unanimously recommended he repeat the rotations. (Pl. dep. ex 4, 15 BRM0152-153; McCarley dep. ex 6).

72. The Plaintiff wrote to the VA internal investigator on September 4, 2002 that "the Director has expressed her disliking and biased opinion against the doctors of Indian origin on several occasions, because she thinks that `they are smart and confident.'" (Pl. dep. ex 1 VA262).

73. The Plaintiff alleged that Dr. Mushrush repeatedly humiliated him by calling him "bad boy" in front of others but later testified that he learned second hand that on two occasions, he was referred to as a "bad boy." One of the two alleged incidents involved her asking "where is that bad boy" because the Plaintiff was absent from a conference. (Pl. dep. p 109-111).  Plaintiff also wrote about the term being used on one occasion. (VA173).  He was not able to say what caused him to believe that the comment was racially motivated or was offensive to him.  (Pl dep. 109-110).

Comparators

74. The Plaintiff's claim that he was treated differently than similarly situated non-Indian and non-south Asian residents arises from conversations he had with fellow residents: "we know, we all talk about that rotation with each other, so I know other residents have more severe problems than I have."   (Pl. dep.  325, 330, 332, 334). The Plaintiff

did not know the names of all of the supervisors who he thinks his comparators had problems with.  (Pl. dep. 326).  He has seen a critical letter that one colleague received but saw no one else's evaluations.  (Pl. dep.  329, 331).  Dr. Kirshner told the Plaintiff that he "puts [him] above average."  (Pl. dep. 331).  The Plaintiff produced no other evidence regarding comparators.

Harvard Participation in Conciliation

75. Prior to filing suit, the Plaintiff did not file a formal a charge of discrimination against Harvard with the Equal Employment Opportunity Commission, or the Massachusetts Commission Against Discrimination.  (VA002-3; Pl. dep. 307).  The Plaintiff did not file an internal charge of discrimination with Harvard. (Pl. dep. 305, 316; Dale aff. ¶4).

76. The Plaintiff did not name Harvard as a party in his internal VA EEO charge of discrimination or in his subsequent appeals to the EEOC.  (Pl. dep. ex 3; VA002-003).

77. No Harvard representative attended any of the VA or EEO conferences nor was it contacted about the Plaintiff's charge of discrimination prior to the filing of this lawsuit. (Dale Aff. ¶¶ 4 & 5).

78. Before filing his internal VA complaint, the Plaintiff  "went to the attorney and all that and found out the procedure to make complaints."  (Pl. dep. 342, 343).

79. The Plaintiff did not make timely initial contact with an EEO counselor at the VA regarding his charge of discrimination,  as is required by law. (VA002-003;  Pl. dep. ex. 3).   All of his subsequent appeals were denied because, among other reasons, the Plaintiff failed to file a timely complaint with a counselor.  2004 WL 1494335 EEOC DO 1A40345 (June 16, 2004).

Defamation

80. Dr. Mushrush's alleged defamatory statements are as follows: none of the Plaintiff's supervisors liked him, he had problems in all of his rotations, he was not a good psychiatrist, patients did not like him, and he failed all of his rotations. (Pl. dep. 289-303).

81. The Plaintiff did not hear these statements but says that he learned of each conversation through other physicians at the VA, including Dr. Scott Rauch, an employee of the Massachusetts General Hospital; Dr. Kirshner and Dr. Mufson, both of the VA; a person the Plaintiff thinks is named Dr. Dan Ione; and Dr. Chang. The Plaintiff does not know whether an allegedly defamatory written report by Dr. Mushrush was published to any third party. (Pl. dep. 291-302). All of the allegedly defamatory conversations concerned Dr. Mushrush's assessment of the Plaintiff's work performance and were made to other physicians who were apparently considering hiring or were supervising the Plaintiff's residency training. (Pl. dep. 289-306).

82. The Plaintiff places the allegedly defaming statements within a four year time period between 1999 and 2004, a period in which he was in the Program. (Pl. dep. 292).

Board of Registration Licensure

83. Dr. Mushrush signed the Plaintiff's application for his annual limited license and a "change of program" medical license to the BRM at least four times between 1999 and 2004, each time recommending the Plaintiff for limited licensure. (Mushrush dep. II 25 -31). The limited license form does not contain a question about whether a resident is on probation. (Pl. dep. ex 11). Dr. Mushrush did not believe that the Plaintiff's probationary status constituted a "disciplinary action" on the BRM license form, and accordingly answered "no" to a question on the application forms that

17

asked whether the Plaintiff had been or was subject to disciplinary action in the Program. (Mushrush dep. II 26-27).

84. In February 2004, the Plaintiff submitted an application for full licensure to practice medicine to the BRM. A full license is required to practice medicine without being supervised or monitored by another physician. (Pl. dep. ex 11 BRM 0054). Each state requires a physician to obtain a separate license to practice medicine within its borders. (Pl. dep. 349).

85. The Plaintiff reported to the BRM in his application for full licensure that if licensed, he intended to work for Massachusetts General Hospital, which is affiliated with Harvard Medical School. (Pl. dep. ex 11 BRM0065).

86. The BRM contacted the Plaintiff about his full medical license application, which was deemed incomplete because he did not include complete information concerning his work prior to entering the Program, his malpractice insurance and other required information. (Pl. dep. ex 12 BRM 0094, 0096, 0100). Reasons unrelated to Dr. Mushrush delayed the Plaintiff's full and "change of program" license applications to the BRM in 2004. (Pl. dep. 238-46).

87. Dr. Mushrush had a duty to provide information to the BRM that it requested. (Pl. dep. 268). At the BRM's request, Dr. Mushrush subsequently sent it a letter explaining the circumstances of the Plaintiff's probation and noting that the Plaintiff was "intelligent and knowledgeable." (Pl. dep. ex 13 BRM0185-0186).

88. In June 2004, The BRM decided to defer the Plaintiff's application for a full medical license until he underwent a psychiatric evaluation to determine his "suitability for a Behavioral Health Monitoring Contract." (Pl. dep. ex 12 BRM0101). The Monitoring Contract is imposed as a condition to licensing applicants and requires

regular monitoring and reporting on the Plaintiff's performance by a licensed physician. (Pl. dep. ex 12 BRM 0105-0106).

89. The BRM conducted an independent investigation of the Plaintiff's suitability for full licensure, and also had an independent psychiatrist named Dr. Ronald Meyer assess the Plaintiff. Dr. Meyer, who was not associated with the Program, interviewed Drs. Festin, Kirshner, Mufson, Villa and Bolton, as well as Dr. Mushrush as part of his evaluation. Dr. Meyer did not report to the Plaintiff what any of the physicians said other than that the Plaintiff had a problem listening to others. (Pl. dep.64-67).

90. In 2004, as a result of his evaluation of the Plaintiff, Dr. Meyer recommended to the BRM that the Plaintiff should be subject to Behavioral Health Monitoring. (Pl. dep. 61-65). The BRM notified the Plaintiff that it would require him to enter into a Behavioral Monitoring Contract for a period of five years. (Pl. dep. ex 12 BRM105-106, 109).

91. The Plaintiff did not agree to the BRM's conditions for licensure, including monitoring, psychotherapy, group therapy, and regular meetings with three monitoring physicians. (Pl. dep. 257).

92. The Plaintiff tried to modify the terms of the Behavioral Monitoring Contract prepared by the BRM and asked the BRM to "waive the monitoring requirements" (Pl. dep. 77, ex 12 BRM0111).

93. The BRM did not accept the Plaintiff's request to modify the monitoring contract and as a result, did not grant his full license to practice medicine. (Pl. dep. 74-79). No action has been taken on the Plaintiff's license for almost 1 ½ years.

Retaliation

94. The Plaintiff claims Dr. Mushrush retaliated against him for filing his internal EEO complaint by answering "yes" to a question that the BRM posed to her in 2004 about whether the Plaintiff had ever been placed on probation. (Pl. dep. 309-11).

95. The period of time between the Plaintiff's EEO complaint and Dr. Mushrush's report of probation was one year and two thirds. (Pl. dep. 312-314). The Plaintiff's only basis for drawing a causal connection between the protected activity and the retaliation was that "I don't see any other reason why she mentioned probation." (Pl. dep. 314).

96. The Plaintiff presented no evidence to support his contention that Dr. Mushrush's delay in completing his license application was related to his filing his EEO complaint. He has no evidence indicating that Dr. Mushrush interfered with him obtaining any of his paid fellowships. (Pl. dep. 315).

Mental Status; Health & Damages

97. In explaining to the EEOC why he did not promptly contact an EEO official for months about his alleged discrimination, on September 4, 2002, the Plaintiff wrote "The mental stress . . . made me cognitively disoriented. My blood pressure increased to life threatening level and I had major depression. I was bed ridden until last weekend . . ." (Pl. dep. ex 2). He testified in 2006 that he was "completely disoriented for a month and a half" and that the disorientation lasted, off and on, for two to three months. (Pl. dep. 343).

98. In an explanation to the BRM in April 2004, however, the Plaintiff wrote "in July of 2002, I briefly became anxious and sad for various reasons, I therefore had an hour-long clinical consultation with a psychiatrist . . . he advised me to consider taking a short course of an anti depressant medication if the symptoms persist. . . I however

20

never used the referral or the prescription because my symptoms improved within a few days." (Pl. dep. ex. 11 BRM0069). The Plaintiff said that he was not going to take the anti-depressant medication prescribed by Dr. Salzman. (Mushrush dep. 165)

99. In a September 4, 2002 written statement to an EEO counselor referring to the Program director's discriminatory acts Plaintiff wrote that "This discrimination has caused considerable physical and mental stress, resulting in increase of my blood pressure to a life threatening level. I have also been diagnosed to have major depression after the above incidence. I am currently taking medications for both of these conditions." (Pl. dep. ex 1 VA262).

100.    The record contains no documentary evidence that the onset of the Plaintiff's high blood pressure began in 2002. There is no documentary evidence in the record indicating that there was a causal connection between his illness (high blood pressure and alleged depression), and his difficulties in the Program.

101.    During his fourth year in the Program, the plaintiff received a grant directly from Harvard Medical School. (McCarley dep. 91-92).


                                        Respectfully submitted,
                                        Defendant, President and Fellows of
                                        Harvard College,
                                        By its attorneys,

                                        /s/ Daniel S. Field
                                        Robert P. Joy, Esq. (BBO No. 254820)
                                        Daniel S. Field, Esq. (BBO No. 560096)
                                        MORGAN, BROWN & JOY, LLP
                                        200 State Street
                                        Boston, MA 02109-2605
Date:   September 29, 2006              (617) 523-6666


21

**<u>Certificate of Service</u>**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 29, 2006.

<u>/s/ Daniel S. Field</u>
Daniel S. Field
