UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RAJENDRA D. BADGAIYAN, M.D.

　　　　Plaintiff

v.　　　　　　　　　　　　　　　　　　　　　C.A. No. 04-12031-JLT

ANTHONY J. PRINCIPI, Secretary,
Department of Veterans' Affairs;
President and Fellows of
HARVARD COLLEGE; and
GRACE J. MUSHRUSH, M.D.,

　　　　Defendants

PLAINTIFF'S OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT FILED BY
DEFENDANTS PRESIDENT AND FELLOWS OF HARVARD COLLEGE

Introduction

　　　　The plaintiff is a physician of South Asian (Indian) national origin. He entered the Harvard South Shore Psychiatry Residency Training Program (the "program"), operated jointly by the U.S. Department of Veterans' Affairs and Harvard Medical School, to train residents in psychiatry. He currently works as an Assistant Professor at Harvard Medical School and as an associate neuroscientist at Massachusetts General Hospital. He brought the instant complaint alleging that he was subjected to unlawful discrimination on the basis of his national origin during his training.

　　　　It is not necessary for the finder of fact to determine whether the plaintiff's performance was outstanding, inadequate, or somewhere in between. The undisputed fact remains that the plaintiff successfully finished the program and a majority of his supervisors rated his

Page 1

performance either outstanding, or good. Because of the actions of the defendants he however, has not been able to get a license to practice medicine.

It is respectfully submitted that a jury could reasonably find a.) that the program director made repeated statements that evidence an animus toward physicians of South Asian origin, b.) that the plaintiff was not afforded the disciplinary procedural protections given to a white trainee whose performance raised concerns, c). that the defendants had created a hostile work environment for the plaintiff, d.) that the plaintiff suffered foreseeable and serious physical, emotional and financial distress over disparate, discriminatory and adverse workplace treatment on the basis of his national origin, and d.) the  plaintiff was intentionally defamed that resulted in the loss of his professional and personal reputation.

Summary of Plaintiff's Case

The core contention of the plaintiff is that because of the oft-articulated bias of the program director (defendant Grace Mushrush, M.D.), infra, he was subjected to disparate, discriminatory and adverse treatment in the workplace, which caused him severe physical, emotional, and financial distress. It impacted negatively on his professional and personal reputation and in his quest to obtain a license to practice medicine in Massachusetts.

The plaintiff is able to establish an articulated bias by his program director, defendant Dr. Mushrush, against physicians of South Asian origin, and specific instances of discriminatory treatment based on his national origin:

Disparate Treatment Compared to White Trainee

On April 3, 2000, a white trainee (Dr. Raluca Savu, M.D.) was given a formal, written warning by Dr. Mushrush. This written warning (Exhibit 1, with identifying Affidavit of Dr. Raluca Savu, M.D.) detailed Dr. Savu's shortcomings as a trainee,

Page 2

itemized the specific areas in which improvement was mandatory and listed the specific assistance she would be given to overcome her shortcomings. Once this white trainee met the goals set out by Dr. Mushrush, she was assured that "this letter of warning will be lifted." She was further advised that her performance would be reviewed in two weeks and "[a]t that time a decision will be made whether to put [you] on probation or to lift the warning."

On July 6, 2001, the plaintiff, on the other hand, received a stark *email* from Dr. Mushrush stating, *after the fact*, that he had been placed on probation. (Exhibit 2, comprised of Exhibit 1 from Mushrush deposition).  He had not been given the benefit of a written, detailed, formal warning, (Exhibit 13, Mushrush deposition) with an action and assistance plan and a review date, such as was afforded the white trainee. Further, the plaintiff was not provided any evidence to support any of the grounds on which alleged probation was based. Documents provided by the defense reveal that none of the grounds are correct. No evidence was provided to indicate that  any of the three committees that oversee a resident's performance, ever approved or even discussed the probation. In addition, the rules of Harvard Medical School do not authorized Dr. Mushrush to put a resident on probation (Exhibit 3), and Dr. Mushrush testified that she did not follow any rule to put him on probation (Mushrush dep. I, 178; II 20-23).

Even though the documents confirm that the plaintiff was discriminated, only jury can decide whether there was sufficient evidence that warranted this adverse action against the plaintiff.

<u>The Disappearing and Resurfacing of Plaintiff's Placement on Probation</u>

After getting the July 6, 2001 email purporting to place him on probation, the plaintiff

Page 3

protested to the defendant Mushrush (BRM149), who then advised him to "forget about [the] e-mail, it's not official...nothing will become of it outside the training program." See Exhibit 4, comprised of excerpt from plaintiff's deposition.

That seemed to be the case. Following the July 6, 2001 email, the plaintiff twice had to submit yearly Renewal Applications to the Board of Registration in Medicine so that he could continue in the program. On both the February 14, 2002 and February 15, 2003 Renewal Applications (Exhibit 5, Exhibit 5(a) & (b)), in the portion of the form that defendant Mushrush had to fill in, she checked "No" in the box asking if the applicant has "been subject to past or pending disciplinary action in this program?"

Further, the plaintiff was never taken off the probation even though he graduated the program (Mushrush dep. I, 187). Thus, it was a fair assumption on the part of the plaintiff that he had not been officially placed on probation, and that, the email from defendant Dr. Mushrush purporting to do so was just another incidence of harassment and intentional infliction of emotional injury.

Yet, after the plaintiff successfully completed the program and was applying for a permanent license, the alleged probation "resurfaced" in the portion of the form that defendant Mushrush submitted in February of 2004. Exhibit 6.

The plaintiff, who had taken Dr. Mushrush at her word, that his probation was unofficial and off the record. He, in his application for permanent license checked 'No; to the question whether any disciplinary action was taken against him. Dr. Mushrush had answered 'No' to the same question in each of the plaintiff's 6 applications for limited license submitted by her to the Board of Registration (BRM0035-0053).

He then received a letter from the Board of Registration specifying that the probation

Page 4

constitutes disciplinary action and demanding an explanation as to why he didn't reveal that he had once been placed on probation. It is beyond peradventure that the plaintiff thus got off to a poor start with the Board of Registration. Exhibit 7, comprised of BRM0099, letter from the Board to the plaintiff. Had Dr Mushrush truthfully mentioned to the board that the plaintiff was not officially put on probation, he would have received a permanent license to practice medicine in early 2004.

In addition, Dr. Mushrush gave conflicting accounts of the main reason why the plaintiff was put on probation. Initially she said that it was because he failed an oral test (Exhibit 2 and 12), and later claimed it was because the plaintiff refused to re-take the test (Exhibit 6). She also provided conflicting testimony concerning existence of documents related to the alleged refusal. In her first deposition she testified that it was extensively documented (Mushrush dep. I, 160-161), but in the second deposition she testified that she does not know if it was documented (Mushrush dep. II 25). The defendants have not provided any document to support that the defendant ever refused to re-take the test. More surprisingly, documents provided by the defendants indicate that the plaintiff never failed the test (BRM0141-143).

Thus, the whole story about the plaintiff's failure and his refusal to re-take the test was a concocted story on the basis of which he was placed on alleged probation, humiliated, and alleged to have poor attitude and lack of professional competence. This concoction ultimately led to the curtailment of the plaintiff's professional life and career because he was not able to get a license to practice medicine.

Since defendants have not provided any document suggesting that the plaintiff was asked to re-take the test, and the plaintiff denies the contention (Pl. dep. 35,40), only a jury can decide the reason for concoction, and the veracity of defendants' claims. As mentioned earlier, this

Page 5

decision is significant because it played an important role in curtailing the plaintiff's professional career.

### Other Incidents of Concoction

The story about the plaintiff's failure and refusal to re-take the oral test is unfortunately not the only incidence of concoction and distortion of facts. Dr Mushrush testified that all of the plaintiff's supervisor complained about his attitude and performance. The evaluation of plaintiff's supervisors submitted by the defense however indicate that except one, all of his about 30 supervisors have rated his performance and attitude either as outstanding, good or satisfactory (BRM 114-140; BRM0166,0167). Some of them have given him perfect score (5 out of 5) in all 17 areas evaluated. This obviously would not have been possible if all of his supervisors had complained about his attitude. Most of his supervisors' have rated his attitude either 'outstanding' or 'good', even though defendants have suppressed some of the best evaluations that the plaintiff received during his training. Moreover, there are doubts about the veracity of the evaluation of Dr Bolton that rated the plaintiff's performance as marginal to satisfactory. The defense has produced two different versions of this evaluation and there is evidence that this evaluation was tampered with (Mushrush dep. I, 123-128). In any event because Dr Bolton supervised him for only 2 days, this evaluation represents the plaintiff's 2 days' of work during his 4 years' training. This tempered evaluation was labeled as a failure in a rotation and cited as a reason to force the plaintiff to repeat clinical rotations for 6 additional months (VA237). The veracity of this evaluation is also doubtful because it mentions that the plaintiff was absent for many days without authorization. The plaintiff denied this accusation and asserted that he was never warned or reprimanded for being absent without authorization, and received full salary during his training (except for the period when he was on approved sick leave). Plaintiff's

Page 6

Affidavit, paragraph 1. The defense has not produced any document that would contradict the plaintiff's assertions. Moreover, the circumstances also suggest that the accusation may not be true. Even if we accept the defendants' contention that Dr Bolton's evaluation represented evaluation of 5 supervisors of the rotation, which the plaintiff was supposed to attend for only16 days (4 days a week x 4 weeks). During this period, he was on an authorized leave of 5 days (Exhibit 14). Out of the 11 days that was supposed to work, the documents submitted by the defense confirm that he was supervised by 5 different physicians (BRM0126). It is therefore highly unlikely that the plaintiff had several days' unauthorized absence in this rotation, particularly because the dates of the absence were not specified and no evidence of a warning or reprimand for this absence was produced. This evaluation of suspected veracity was used by the defendants to claim that the plaintiff's supervisors consistently complained about his absence (Mushrush dep. I, 156). No other evaluation produced by the defense indicates that the plaintiff had any unauthorized absence.

The defendants produced an evaluation of a supposed 2-week rotation with Dr. Osser at Taunton State Hospital (BRM0130). The plaintiff never had this two-week rotation. Even though this concocted evaluation gave the plaintiff a satisfactory rating, it was used by the defendants to state that the plaintiff's performance was poor in his rotation at Taunton State Hospital (Mushrush dep. 146).

The same supervisor Dr Osser however supervised the plaintiff briefly (5-6 two-hour sessions). In this rotation the plaintiff helped him with the treatment of 3 or 4 patients (out of several hundreds he treated during his training). One of these patients gave a letter of appreciation for the plaintiff (BRM0132; Mushrush dep. I, 185) for the second patient Dr Osser had made a wrong diagnosis. The plaintiff corrected it and at end of rotation Dr Osser told him

Page 7

that his performance was good to outstanding. But the defense had produced an evaluation that has rated this performance as satisfactory and long note that includes suggestions for improvement. This evaluation or the note was never shown to the plaintiff who does not believe that the issues raised are correct (Plaintiff's Affidavit, paragraph 2). He also mentioned that the plaintiff has "several strengths, has (sic) – good rapport and ability to engage a patient psychotherapeutically, good ability to writeup his case clearly, coherently, with good psychoanalytic diagnosis..". He gave above average evaluation of the rotation (3.4 out of 5). This evaluation was however cited as a complaint by the defendant (VA237). Even if these two evaluations are taken at their face values, they comprise (10 days and 10-12 hours) only a small fraction of the plaintiff's 4 years' training. Based on these two evaluations (none of them failed the plaintiff), the defense has characterized that the plaintiff's performance was poor during the training, ignoring outstanding, good or satisfactory evaluations he received during the rest of his training.

He was also accused of having poor performance in a  number rotations (VA237)  in which his performance was rated by his supervisors either as good or satisfactory (BRM 0135,0136,0140,0166,0167).

It was also accused that the patients of the plaintiff were unhappy with him (Harvard statement of material facts paragraph 23). The defense however has not provided any document from any patient to support this accusation and Dr Mushrush testified that the patient's appreciation for the plaintiff is on record (BRM0132; Mushrush dep. I, 185)

The defense has also produced supposed complaints of Dr Gurrera. These complaints were never shown to the plaintiff during his training and the defense has not produced evidence to suggest that veracity these complaints.

Similarly, the board of registration in medicine was told by Dr Mushrush that the plaintiff has problem working with female supervisors. The documents submitted by the defense however suggest that none of his female supervisors thought that he had problem working with female supervisors. The female supervised him for 4 months rated his performance as 'good' and mentioned that he follows instructions and suggestions (BRM123).

More disturbingly, the defense has produced three different versions (VA 228, VA 152-153, VA 277) of the supposed minutes of the promotions committee that purportedly recommended adverse actions against the plaintiff. All of them are signed by Dr. Mushrush, and none has signatures of the other members of the committee.

Since the documents produced by the defense suggest that the stories of the plaintiff's poor performance, failures, authorized absence, and his inability to work with female supervisors are not correct, a jury trial is necessary to establish whether these accusations are concocted.

The Program*'s* Director's Articulated Animus Against Physicians of South Asian Origin

A deposition was taken of a former trainee in the program, Dr. Aafaque Akhter, MD, himself a physician of Indian national origin. He testified that he was subjected to a scurrilous verbal tirade, rife with insults to his national origin, by one of the senior physicians in the program. He testified that when he complained about this to Dr. Mushrush, her only comment was that Indian doctors "are very annoying. They are very annoying. It's not that people get intimidated. They are very annoying." He also testified that other physicians of Indian national origin were subjected to discriminatory treatments by Dr. Mushrush. Exhibit 8, excerpts from Akhter deposition.

The plaintiff testified to repeated, hostile and defamatory remarks about physicians of South Asian origin, made by defendant Mushrush to his face and in public. Exhibit 9, excerpts

Page 9

from plaintiff's deposition.

The plaintiff is a highly accomplished medical researcher. He holds a position of an Assistant Professor at Harvard Medical School, and that of an Associate Neuroscientist at Massachusetts General Hospital, Boston. Being abruptly placed on a supposed probation without the procedural safeguards afforded to a white trainee, subjected to the repeated denigrations of physicians of South Asian origin and forced to endure egregiously disparate treatment were crushing blows, causing severe physical, emotional and financial distress. In addition it lead to the loss of his professional and personal standing.

A jury will find that the plaintiff and Dr Akhter's testimony concerning articulated animus of the program director is credible.

Discrimination in the Performance Evaluation, Promotion, and Assignment of Duties:

During his training, the plaintiff was discriminated against other residents by not showing him his performance evaluations in the last 3 years of his training, even though, it is an essential component of the training and is mandatory for all accredited institutions (Exhibit 15). He was not allowed to use the benefit of feedback he received from his supervisors. Since the feedback is an essential component of any training, the program hindered the plaintiff's pace of professional growth and training. He was further discriminated by not considering his outstanding performance in the test of clinical skill, PRITE (he was first in the class and performed better than 90% of his senior colleagues) in deciding his promotion (Exhibit 10 and 12). It was a policy of the program to give credit for the performance in this test (Exhibit 10).

Further, as a condition of graduation, the plaintiff was asked to make a web site for the program (Exhibit 11). Since the plaintiff is a medical  doctor and is not trained to carry out this job, he had to spend several hundred hours to complete the task. This was on top of his regular

Page 10

clinical duties that he was assigned to do. A jury could find that the plaintiff was asked to make the web site to harass and to distract him from his training because even though he completed the assignment, the web site was never published (Plaintiff's Affidavit, paragraph 3). In addition, even though every resident in the program received adverse remarks from some of his/her supervisors during the training (Mushrush dep. I 192), only those of the plaintiff were forwarded to the Board of Registration in Medicine and to the Head of Harvard Psychiatry department. Moreover, these remarks were never shown to the plaintiff during his training, they were never investigated and the plaintiff was never given an opportunity to explain his position. (Plaintiff's Affidavit, paragraph 3).

Since no explanation was offered for these discriminatory treatments, a jury can decide the extent to which these actions affected the plaintiff's professional growth and training.

Creation of hostile work environment:

The plaintiff was subjected to discriminatory and hostile work environment during his training. Not only was he allegedly put on probation without a valid reason, he was also not promoted to the next level (VA237) and was asked to repeat certain parts of his training that he had passed with either outstanding, good or satisfactory rating (BRM 114-140; BRM0166,0167). Again without showing him any evidence to justify this adverse action. Further, he was falsely accused of delaying a patient's transfer and mismanaging another patient's treatment. In addition, the program director repeatedly and publicly made false accusations against the plaintiff and denigrated his professional judgment. As mentioned in the preceding paragraphs, Dr Mushrush testified, published and spread concocted stories to defame the plaintiff and make it difficult for him to work. Documents concerning some of these actions surfaced in the discovery (e.g., Exhibit 12). False accusations that the plaintiff had failed an oral test, several

Page 11

rotations and that he had not completed certain parts of the required training were published and are  part of the legal record of this suite. His supervisors were given incorrect and derogatory information concerning his performance and he was forced to carryout nonprofessional work unrelated to his training (VA 238; Mushrush dep. I, 196). To further humiliate the plaintiff he was not given diploma in the commencement ceremony of the program held in 2003. (Plaintiff's Affidavit, paragraph 4).

Because no document was provided to justify these hostilities, a jury trial is necessary to determine whether Dr. Mushrush had intentionally created a hostile and humiliating work environment for the plaintiff.

Thus, summary judgment is not warranted, as a finder of fact 1.) that she harbored and indeed articulated an animus toward physicians of South Asian origin, 2.) that she subjected the plaintiff to disparate, discriminatory, adverse and humiliating workplace treatment, 3.) which caused him foreseeable and severe physical, emotional and financial distress, denigrated his professional and personal reputation, and unfairly sabotaged his application for medical license.

Summary judgment is also not warranted because a.) the plaintiff has produced documentary evidence of discrimination, indicating that he was not treated the way a white colleague was treated in initiating disciplinary action (probation) , b) because defense has refused to provide training record of the defendant, many material facts remain undiscovered, c) inconsistent testimony of the program director concerning reason and documentation of alleged probation, d.) marginal to satisfactory evaluation of a single supervisor who supervised the resident for just 2 days during his 4 years' training was emphasized, and consistent 'outstanding' and 'good' evaluations of his long-term supervisors were ignored to define the plaintiff's training performance, e) a number of statements of Dr. Mushrush were contradicted by the

Page 12

plaintiff and the witness.

Facts concerning all of these issues can only be revealed in a jury trial, which will allow evaluation of the credibility of the plaintiff, defendants, and witnesses.


Plaintiff's Response to Harvard's Legal Arguments

I. That the Plaintiff Did Not Met the Requirements to Sue

As this Court found in its Memorandum and Order of October 26, 2005, "[i[t is undisputed that the Plaintiff fully exhausted EEOC remedies in its claims against Defendant Department of Veterans Affairs." (Defendant VA does not argue otherwise in its own current Motion for Summary Judgment.)

The instant contention by Harvard that the plaintiff did not meet the administrative requirements to sue is inextricably entwined with that addressed in the next section (that Harvard is not responsible for defendant Mushrush's action), about which, anon.

Of course, pro se status does not relieve an employee of the obligation to meet procedural requirements established by law. U.S. v. Michaud, 925 f.2d 37, 41 (1st Cir.1991).

However, where, as here, the employee acts pro se, the administrative charge is liberally construed in order to afford the complainant the benefit of any reasonable doubt. Westphal v. Waukesha Dressler/Waukesha Engine Div., 855 F. Supp 1009, 1015 (E.D. Wis. 1994); Pickney v. Am.Dist.Tel.Co., 568 F. Supp. 687, 690 (E.D. Ark.1983).

An employee is not required to comprehensively set forth with "literary exactitude" all of the facts and theories upon which his or her complaint is based. Powers v. Grinnell Corp., 915 F.2 34, 37 (1st Cir.1990) (addressing charge requirements under the ADEA).

"[T]he scope of the civil charge complaint is... limited by the charge filed with the

Page 13

EEOC *and the investigation which can reasonably be expected to grow out of that charge*."
Power, supra, at 38, quoting Less v. Nestle Co., 705 F. SUPP. 110, 112 (W.D.N.Y.1988).
(Emphasis supplied).

If the claim omitted from the administrative complaint "reasonably grow[s] out of the
[claim or] claims made therein" then such omitted claims may be pursued in the district court.
Weiss v. Coca Cola Bottling Co. of Chicago, 990 F.2d 333 (7th Cir. 1993). See also Oxman v.
WLS-TV, 12 F.3d 652, 660 (7th Circ. 1993); Schnellbacecher v. Baskin Clothing, 887 F.2d 124,
127 (7th Cir. 1989) (noting that "a limited EEOC investigation [of an administrative complaint]
will not necessarily defeat a [district court] complaint where [the district court] complaint
contains allegations like or reasonably related to the EEOC charge [i.e. the administrative
complaint], but which the EEOC failed to investigate.")

The August 5, 2003 report of the EEO Counsel (Exhibit 16) specifically noted that the
plaintiff submitted evidence pertaining to the July 2001 email (misdated as July 1 instead of July
6) and it is beyond peradventure that this issue was not investigated. Indeed, the plaintiff could
not have known that his purported probation was not unofficial and off the record, as he was
assured by defendant Mushrush, until it "resurfaced" (after not appearing in two interim license
application forms completed by defendant Mushrush) in the defendant Mushrush's portion of the
plaintiff's application for a permanent license.

Since the VA does not and cannot contend that the plaintiff failed to exhaust his
administrative remedies, nor then can Harvard, due to its substantial identity with the VA, to
which issue plaintiff now turns. Moreover, the plaintiff specifically named Dr. Mushrush and
identified her the Director of the program, which is jointly operated by the VA and Harvard, and
she as an agent of both entities fully participated in the EEOC proceedings.

Page 14

II. That Harvard Is Not Responsible for Defendant Mushrush's Actions

Again, as this Court found in its Memorandum and Order of October 26, 2005, "[i[t is undisputed that the Plaintiff fully exhausted EEOC remedies in its claims against Defendant Department of Veterans Affairs."

Harvard now makes the same argument that it made when moving for summary judgment in the discrimination suite against the same program, *Moira Locke v. Harvard University, President and Fellows of Harvard College, Veterans Administration and the United States of America*, 03-CV-11573-MEL.

In denying Harvard's motion for summary judgment in that case, Judge Lasker wrote (Exhibit 17):

"[Harvard contends] that the Harvard South Shore Psychiatric Residency Program is not an entity within the control of Harvard, that no Harvard employee has the authority to award oar rescind residency positions at the Brockton/West Roxbury Veterans' Administration ("VA"), and that Dr. Grace Mushrush ("Mushrush") is not a Harvard Medical School employee but was rather acting within the scope of her employment with the VA.

"However, Harvard's website identifies Mushrush as the Director of the Harvard South Shore Residency Training Program, names Mushrush as an Assistant Professor of Psychiatry at Harvard Medical School, and lists her email address on the Harvard Medical School server... Finally, the Affiliation Agreement between Harvard and the VA states that they "have a shared responsibility for the academic enterprise" and that the medical school "[n]ominates residents and fellows for academic programs operated jointly by the VA and the affiliated school." See Exhibit 18.

All of the foregoing obtains in the case at bar. Exhibit 18.

Page 15

In addition, Dr. Mushrush's letters of May 28, 2002 and October 2, 2002 to the plaintiff and to the Board of Registration in Medicine on February 24, 2004, are on stationery with the letterhead "The Harvard South Shore Psychiatry Residency Training Program," with "Harvard Medical School" and the "Department of Psychiatry," and prominently flaunt the eminent logo of Harvard. See Exhibit 19, comprised of VA047 and VA048,  Exhibit 6(b) from Mushrush deposition. This stationery was subsequently changed by Harvard. See Exhibit 20.

There are three exceptions to the rule that the failure to name a party in an EEOC complaint precludes a later civil action against that party.

Here, the exceptions that clearly apply are that there was a "substantial identity" between the respondent named in the EEOC charges and the defendants in the civil action and the named respondent, Grace Mushrush, M.D., was an agent for Harvard and fully participated in the administrative proceedings. McKinnon v. Kwong Wah Rst., 83 R.3d 498, 505 (1st Cir. 1996), citing Curran v. Portland Superintending Sch. Comm., 435 F. Supp. 1063, 1074 (D.Me.1977).

Dr. Mushrush draped herself in the august raiment of Harvard throughout the plaintiff's training and if she discriminated against him, Harvard must face the jury with her.

III. That Harvard's Actions Were Lawful

First of all, "[t]he ultimate issue of discrimination, raised by the parties' conflicting evidence as to the defendants' motive, is not for a court to decide on the basis of briefs and transcripts, but is for a fact finder after weighing the circumstantial evidence and assessing the credibility of witnesses." Lipchitz v. Raytheon, 434 Mass. 493, 499 (2001); Labonte v. Hutchins and Wheeler, 424 Mass. 813 at 820; Flesner v. Technical Communications Corp., 410 Mass. 805, 509 (1991).

Page 16

Justice Kass observed that "evidence of discrimination would be circumstantial... It was not likely that employers would declare forbidden bias frontally by, e.g., the publication of policy statements that blacks would be excluded from executive positions or that employees over the age of fifty were to be phased out at the earliest opportunity. Rather, most cases of unlawful discrimination would be stitched together..." Johansen v. NCR Comten, 30 Mass. App. Ct. 294, 298 (1991).

This is the rare case in which a jury could accept the testimony of both the plaintiff and the witness, Dr. Akhter, who was deposed during discovery, and find that the defendant, Mushrush, made repeated, explicit, derogatory comments about physicians of South Asian origin. This articulated bias could also be found by a jury to have informed actions taken by Mushrush against the plaintiff.

Specifically, in light of her articulated bias, Dr. Mushrush's explanations for the mysteriously disappearing and resurfacing of plaintiff's probation would have to be carefully weighed and assessed by the jury and compared with the procedures she afforded a white trainee, Dr. Savu, supra.).

After identifying her July 6, 2001 email placing the plaintiff on probation (Exhibit 2, consisting of Exhibit 1 from Mushrush deposition): Dr. Mushrush testified as follows:

Q. So there were no letters on your stationery advising [plaintiff] A, that he was formally placed on probation, is that correct?

A. That's right.

...

Q. So is it fair to say- - and correct me if I'm wrong- - is it fair to say then that [plaintiff] never got a letter from you saying you better do this, this, and this, or you're in danger of being

Page 17

placed on probation?

A. That's true.

...

Q. Do you recognize that document, Dr. Mushrush?

A. It's the renewal application for a limited license. [Exhibit 4(a)]

Q. And what is the purpose of a renewal application for a limited license?

A. A limited license is good only for one year. So it has to be renewed every year or a resident can't practice.

...

Q. Did you check off no in response to the question, has the physician been subject to past or pending disciplinary action in this program?

A. Yes.

Q. And what is the date of your signature?

A. 2/14/02.

Q. So that followed the July '01 email placing [plaintiff] on probation, am I correct?

A. Yes.

Q. And was there a reason that you checked "no" to past or pending disciplinary action?

A. Well, there are grades of disciplinary action and not all of them get reported to the board. You know, there are only the very serious ones get reported to the board. I didn't consider his not having passed this test as serious because there were a number of people who hadn't passed it, and I thought it was just - - it didn't reflect- - it reflected more his stubbornness and his attitude, and I didn't think I wanted to at this point make an issue with the board. (Emphasis supplied).

Page 18

Note that Dr. Mushrush was given the opportunity to make the distinction her counsel tries to make, that discipline and probation are two different things. She did not make such an assertion, only that "there are grades of disciplinary action" and that the plaintiff's action was not "serious."

Q. Do you recognize that document, Dr. Mushrush?

A. Yes. It's the same document a year later. [Exhibit 4(b)]

Q. A year later. And is it true as well then for Section B that's your signature, date and a check in the box where "no" to the question, has the physician been subject to past or pending disciplinary action in this program?

A. Yes.

Q. And the reason that you checked "no," was that the same as you have explained for the initial renewal?

A. Yes.

Q. Would you agree that being placed on probation is a black mark on a resident or fellow's training at the Brockton V.A.?

A. It depends on what kind of probation.

After identifying the plaintiff's application for a permanent license [Exhibit 6]:

Q. And the date of your signature is given there as well?

A. 2/24/06.

Q. So [plaintiff] would have finished his training at the Brockton V.A. then, am I right?

A. That's true.

...

Q. Specifically, it's referring, Doctor, to Question No. 2 on the first page, was the

applicant ever placed on probation where the box for yes is checked off.

A. Uh-huh.

Q. Is that correct?

A. Yes.

Q. And you placed that checkmark under yes, am I right?

A. Yes.

Q. The applicant had been placed on probation?

A. Right.

Q. If the fact of his probation wasn't important enough for the first renewal [application], why did you check "yes" on this application [for a permanent license], Doctor? (Emphasis supplied).

A. This- - this a more serious thing. It's a permanent license, and I felt that there - - there had been other things that had happened including the extension of his training, et cetera that has been a problem. So I felt that there should be some record of it.

...

Q. Weren't the other issues to which you alluded addressed by checking "yes" to [question] No. 4, that there had been negative reports about [plaintiff]?

A. Well, there had also been an action in that he was required to extend his training.

Q. Was he ever placed on probation other than the instance that was initiated by your July 2001 email? (Emphasis supplied).

A. Not- - not per se probation. We don't - - we don't generally label things that way.

Q. So the only time the word "probation" appears is in the July 1 email, correct?

A. Yes.

Page 20

...

Q. So the July '01 email was the only time the word "probation" appeared?

A. Yes.

Q. [Plaintiff] was never formally or informally placed on probation during the rest of his training, correct?

A. Correct. Although if he hadn't done it, he would not have been allowed to graduate.

Q. And he did graduate, correct?

A. Yes.

Q. So on this postgraduate verification form where you checked yes, you're referring back to that probation referenced in the July email?

A. Yes.

The plaintiff was entitled to take Dr. Mushrush at her word, when he protested her purporting to place him on probation via the July 2001 email, at which time:

Q. And so it was your hope that this information [concerning being placed on probation] would never come to light with [the Board of Registration in Medicine]?

A. Which information?

Q. This information regarding the official or unofficial probation.

A. I was never on probation.

Q. The facts surrounding it you were hoping would never come to light, correct?

A. I don't know if she believed.

Q. Well, [Dr. Mushrush] sent you an e-mail to that effect, did she not?

A. Yes, but then she also told me, Forget about this e-mail, it's not official; and also she also mentioned very specifically, and I think Dr. Swett, in front of Dr. Swett that nothing will

Page 21

become of it outside the training program. [Exhibit 4]

It seemed, indeed, that the probation email, sent in a moment of frustration and exasperation by Dr. Mushrush, was, as she stated to the plaintiff when he protested, unofficial and off the record.

A scant six months later, Dr. Mushrush, as per her above deposition testimony, did not see fit to mention it on the plaintiff's February 2, 2002 renewal license application. Still again, a year later, she still did not see fit to mention it on the February, 2003 renewal license application.

It is indisputable that Dr. Mushrush never made a distinction between "probation" and "discipline." She did not mention the probation on these interim applications, she testified, only because the matter precipitating her email was not "serious." (Indeed in her letter of February 24, 2004 to the Board of Registration [Exhibit 6(b)] explaining the portion of the plaintiff's permanent license application that she had filled out, Dr. Mushrush responded to the explicit question "Was the applicant ever disciplined or under investigation?" by stating "The answer is no *with the exception of issues in # 2* [Was the applicant ever placed on probation?] and #4 [Were any negative reports ever filed by instructors regarding the applicant?]." (Emphasis supplied).


The plaintiff, fully believing that his purported July 2001 placement on probation was both unofficial and off the record, as defendant Mushrush had assured him, failed to disclose same in his application for a permanent medical license.

The Board of Registration in Medicine, having gotten Dr. Mushrush's 2004 form, demanded that the plaintiff explain his failure to report that he had been on probation. Exhibit 7, BRM0099. He was now under a cloud of suspicion.

Page 22

A jury could find that defendant Mushrush sabotaged the plaintiff's application for a permanent license by resurrecting the so-called probation, the very one that she hadn't seen fit to report on two earlier license renewal applications.

This act by the defendant Mushrush, can be seen as a result of her articulated bias against physicians of South Asian origin and in retaliation for the plaintiff's protected activity of filing an EEOC complaint against her.

IV. That Counts V., VI & VII, Alleging Interference with Advantageous Relations, Defamation and Intentional Infliction of Emotional Distress, are Within the Exclusive Province of Workers' Compensation Actions

Claim of Interference with Advantageous Relations, Defamation and Intentional Infliction of Emotional Distress can best be understood and tried with this suite because the significance and extent of the damage can be better understood in the context of discriminatory actions.

Moreover, at this point the plaintiff has no other avenue to get relief.

Controlling Law

Article 23 of the Universal Declaration of Human Rights provides that everyone "has the right to work, to free choice of employment, to just and favorable conditions of work and to protection against unemployment."

"Evidence of discriminatory motive is elusive and rarely is established by other than circumstantial evidence... the jury must weigh the credibility of conflicting explanations." Blare v. Husky Injection Molding Sys., 419 Mass. 437, 439 (1995).

The "entire purpose of the ... prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." _Price Waterhouse v. Hopkins,_ 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (O'Connor, J., concurring).

Page 23

"The ultimate issue of discrimination, raised by the parties' conflicting evidence as to the defendants' motive, is not for a court to decide on the basis of briefs and transcripts, but is for a fact finder after weighing the circumstantial evidence and assessing the credibility of witnesses." Lipchitz v. Raytheon, 434 Mass. 493, 499 (2001); Labonte v. Hutchins and Wheeler, 424 Mass. 813 at 820; Flesner v. Technical Communications Corp., 410 Mass. 805, 509 (1991).

"In an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind... Permitting, but not requiring the fact finder to draw the inference strikes the proper balance by holding the plaintiff to her ultimate burden without requiring her to produce direct evidence of discriminatory animus, a form of evidence that, we recognize, rarely exists... That inference, combined with the evidence adduced to meet the employee's burden of proof under the first stage of *McDonnell Douglas,* permits the fact finder to conclude that the employee has satisfied her ultimate burden of proving that the decision was made "because of" the unlawful discrimination as G.L.c. 151B, s. 4(1) requires." Lipchitz v. Raytheon, 434 Mass. 493, 501 (2001) (internal citations omitted)

Thus the law and the facts mentioned herein strongly suggest that justice cannot be served if jury is not allowed to examine disputed facts, contradictory testimonies, tempered evaluations, concocted facts, undisclosed documents, intents and actions of the defendants.

Exhibits to Plaintiff's Opposition to Harvard's Motion for Summary Judgment

Exhibit 1, Affidavit of Dr. Raluca Savu identifying letter of warning received from Dr. Mushrush

Exhibit 2, July 2001 "probation" email to plaintiff

Page 24

Exhibit 3, Harvard Medical School rules

Exhibit 4, Plaintiff's deposition testimony re being told to forget it (probation)

Exhibit 5, Exhibit 5(a) & (b), excerpts from Mushrush deposition, discussion of limited license renewal applications

Exhibit 6, Exhibit 6(a) & (b), excerpts from Mushrush deposition, resurfaced probation (application and letter of explanation)

Exhibit 7, from BRM to plaintiff

Exhibit 8, excerpt from Dr. Akhter's deposition, re Mushrush's comments about Indian physicians

Exhibit 9, excerpt from plaintiff's deposition, re Mushrush's comments

Exhibit 10, PRITE results

Exhibit 11, letter directing plaintiff to create a  web site

Exhibit 12, Dr. Swett's letter, re promotions committee

Exhibit 13, excerpt Mushrush deposition re no formal letter of warning.

Exhibit 14, approved leave of the plaintiff.

Exhibit 15, ACGME rules.

Exhibit 16, EEO report referencing July 01 email

Exhibit 17, Judge Lasker's memorandum

Exhibit 18, Memorandum of affiliation and website identification of the program as under Harvard's auspices

Exhibit 19, Mushrush letters on Harvard stationery

Exhibit 20, new stationery used by Dr. Mushrush

Also filed herewith is the <u>Plaintiff's Response to Harvard's Statement of Material Facts</u>, along with the <u>Plaintiff's Affidavit (with Exhibits)</u>.


WHEREFORE, the plaintiff prays that Harvard's Motion for Summary Judgment be denied and that the Honorable Court make such further orders as it deems meet and just.


Respectfully submitted,
the plaintiff,
Rajendra Badgaiyan, M.D.,
by his attorney:
/s/ Gregory R. Barison
_____
Gregory R. Barison
Weston Patrick, P.A.
84 State Street / 11th Floor
Boston, MA 02109-2299
(617) 742-9310
gbarison@comcast.net
BBO # 029340

Date: December 30, 2006